**John W. HARDESTY, Plaintiff,**

**v.**

**ESSEX GROUP, INC., Power Conductor Division; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, and its Local Union No. 1497, Defendants.**

No. L 79–48.

United States District Court,
N.D. Indiana,
Hammond Division at Lafayette.

April 8, 1982.

Richard O. Bovey, Lafayette, Ind., for plaintiff.

Robert J. Tscholl, Fort Wayne, Ind., Barry A. Macey, Indianapolis, Ind., William T. Hopkins, Jr., Steven D. Haaser, Fort Wayne, Ind., Irving J. Smith, South Bend, Ind., for defendants.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

This entry shall be considered as complying with Rule 52 F.R.C.P.

### A. *June 21, 1978 Incident*

At approximately 10:45 o'clock A.M. on June 21, 1978, John Hardesty was in the rubber room at the Essex plant in Lafayette, Indiana. He picked up a disposable lighter he found on the floor. When it did not work, he threw the lighter through an open door that leads to a ramp used by two motors and employees traveling to and from the rubber room. (Tr. 95–97).

Employees Bill Pence and Raymond Keller were walking up the ramp at this time on their way to lunch. (Tr. 56–58). The lighter thrown by Hardesty hit Keller in the right eye and knocked him to his knees. (Tr. 100–101). Hardesty joined Pence and Keller when Keller was still on his knees. He helped Keller to a washroom and apologized for hitting him in the eye. (Tr. 62, 102). Keller was then taken by foreman Bob Gram to a medical clinic which, in turn, sent him to the hospital. Keller spent five days in the hospital and after his release, missed an additional several weeks of work. (Tr. 63–64).

At the time of the incident, there was no dispute over the facts. Hardesty admitted to both Company and Union officials that he had hit Keller in the eye with the lighter. (Tr. 258, 332, 336). When he filed an unfair labor practice charge with the National Labor Relations Board protesting his discharge, he admitted to the investigating agent that he had hit Keller with the lighter. In his affidavit to the National Relations Board, he stated:

> I didn't see two guys coming up the walkway. They were Keller and Bill Pence. The lighter hit Keller in the eye. I helped Keller to the bathroom. Keller was taken to the hospital for 5 days. Keller was off work for thirty days. Keller told me he would not say who did it.

(Defendants' Exhibit K, p. 5; Tr. 162).

In addition, it is obvious that Hardesty admitted hitting Keller with the lighter at his unemployment compensation hearing, as the referee found:

> Claimant (Hardesty) threw a small cigarette lighter from one room through an open door at a trash container in another room. Claimant missed the container and struck another employee in the eye.

(Defendants' Exhibit G).

At trial, plaintiff claimed that he threw the lighter only about ten feet and saw it disappear between two trash containers. (Tr. 98–99). Plaintiff further testified that after he threw it, approximately five minutes elapsed before he encountered Keller on his knees from the impact of being struck. (Tr. 100). Finally, plaintiff claimed that he later found the lighter he threw between the two containers, as much as 20 feet away from where Keller was standing when hit. (Tr. 150).

Plaintiff obviously believed, even by his own testimony, that he had hit Keller, for he admitted at trial that he told Keller: "If I hit you, I am sorry." (Tr. 102).

Therefore, there is no reason for him to have offered even the conditional apology that he admits.

### B. *June 21, 1978: Disciplinary Hearing*

After admitting to foreman Forner that he threw the lighter, Hardesty was summoned to a disciplinary meeting specifically provided for by the collective bargaining agreement. Plaintiff's Exhibit 20, Section 7. At the meeting were Larry Allen, the Company's personnel manager, John Hardesty and Homer Phipps, a Union steward. (Tr. 109, 111–112, 173, 333, Defendants' Exhibit K, p. 5).

At the meeting, Hardesty admitted throwing the lighter that hit Keller. (Tr. 332, Exhibit K, p. 5). He was suspended by Larry Allen and instructed to report to the plant on Friday. Homer Phipps wrote a grievance protesting the suspension; Hardesty signed it and left the plant. (Plaintiff's Exhibit 19A).

### C. *June 23, 1978: Discharge Hearing*

On Friday, June 23, 1978, Hardesty returned to the plant for another meeting, at which Company officials were to announce their decision on the appropriate discipline to be imposed. At this meeting were Jerry Garrison, the plant manager and Larry Allen, the personnel manager, as well as Hardesty, Homer Phipps and Alice Delph, who at the time was the chairperson of the Union's bargaining committee. (Tr. 116–117, 334–335).

The facts were reviewed again, and Larry Allen announced that Hardesty was to be terminated. Hardesty testified that both Phipps and Delph spoke on his behalf and urged the Company to give him a three day disciplinary layoff rather than discharge him. (Tr. 117). The Company officials refused. After the meeting, Hardesty, Delph and Phipps went upstairs and wrote another grievance, this one protesting the discharge. (Tr. 118, Plaintiff's Exhibit 19B).

### D. *June 27, 1978: Third Step Of Grievance Procedure-First Meeting*

The grievance written on June 23, 1978 was denied in writing by Larry Allen on Monday, June 26, 1978, without a meeting. (See Plaintiff's Exhibit 19B). It was then moved to Step 3 of the grievance procedure where it was discussed at a meeting on Tuesday, June 27, 1978.

At the June 27 meeting, the Union was represented by Alice Delph, chairperson of the bargaining committee and Calvin Loveless, member of the bargaining committee. These individuals served on the Local Union's bargaining committee during this period at the direct request of the International Union because no Local Union members had run for positions on the bargaining committee in the Local Union's most recent election in April or May 1978. (Tr. 256–257, 294). This was the first meeting over Hardesty's discharge that Calvin Loveless attended because he had been on vacation the week before when the incident occurred. (Tr. 257).

The meeting began with a review of the facts. There was no dispute as to what happened, as Hardesty had admitted the week before that he hit Keller in the eye with the lighter. (Tr. 259, 335–356). The remainder of the meeting was then devoted to a discussion of the penalty imposed by the Company, with Delph and Loveless arguing that discharge was too severe and Allen and Garrison refusing to change their decision. (Tr. 259–60, 336). At trial, Loveless explained the Union's approach as follows:

> We were trying our best to get as small a penalty as humanly possible. The man admitted his guilt. He had thrown the cigarette lighter that hit Mr. Keller. (Tr. 260).

In keeping with this approach, Delph and Loveless proposed other penalties, short of discharge, but Garrison and Allen refused to yield. (Tr. 260–62). Loveless' testimony on the issue is corroborated by Larry Allen's. With respect to the June 27 meeting, Allen testified as follows:

> Q. What, if anything, happened there? What discussions took place?
> A. Basically, the union was pursuing having him reinstated, and the company said no, we're not going to.

Q. What arguments was the union using?

A. Basically, the penalty of discharge, I believe, was too severe.

Q. What, if any, argument was made with respect to the facts of the case?

A. I don't think that the facts were disputed at all during the whole course of the case. (Tr. 336).

As no progress was being made, the parties adjourned the third step meeting, pursuant to the collective bargaining agreement, until a representative from the International Union and the Company's corporate legal staff were available to meet with the local officials. (Tr. 263, 336). A meeting with these individuals was scheduled for Friday, June 30, 1978.

### E. *June 30, 1978: Third Step Of The Grievance Procedure-Second Meeting*

Ned Davy, a Servicing Representative of the International Union, UAW, attended the June 30 meeting for the Union along with Delph and Loveless. Davy had serviced this Local Union for the International since 1974.

At the time, Local 1497 was one of ten local unions to which Davy was assigned to provide advice and assistance on grievances that reach the higher stages of the grievance procedure and in collective bargaining. One of Davy's primary responsibilities is to advise local unions in making determinations whether to arbitrate grievances (Tr. 292–93). Wilbur (Wib) Swick from the Company's legal staff attended the meeting for the Company along with Allen and Garrison.

After discussing an unrelated grievance early in the meeting, Company and Union officials spent from mid-morning until late afternoon discussing the Hardesty grievance. (Tr. 264, 298). Ned Davy described the meeting as follows:

> We convened that meeting somewhere between nine, 9:30. I don't know the exact time. We asked for a review of the facts of the case. We would have to know them at the third step.

Both parties explained their position. We listened intently to the company's side, as the company did to ours. There was no dispute to the facts of the case. We set down and I believe it was Wib and Jerry on their side of the table who related the case as they knew it. Cal and Alice assisted me in relating the case as we knew it. There was no disputed facts, as I said.

We then proceeded to look at John Hardesty as an individual; what kind of a person was he, was he a good worker, had his name been in the grievance procedure many many times? It had not. The company admitted that John Hardesty was a good worker. He did have some attendance problems. I think at one time he had a write-up for not wearing a respirator. Other than that, there was no detriment to John, as an individual.

The company relayed the facts that John had admitted both in the suspension hearing and in the meeting on June the 27th—which was a termination meeting—that John admitted throwing the lighter, striking Mr. Keller in the eye. He was sorry. He didn't intend to do it. We proceeded along those lines for a mitigated penalty.

> \* \* \* \* \* \*

We said, look, John's been a good employee. He's had some minor problems, nothing of any major catastrophe. Can't you bring him back? Our first offer was bring him back, full seniority, full back pay. That was rejected.

Okay. Let the time off served as a disciplinary layoff. The company said no, that the discharge was for justifiable cause under the terms of the collective bargaining agreement.

Again, we argued; why should he be penalized for that? We have heard that other people throw things. Their response to that was something to the effect that—Who are they? We had no proof that other people had thrown things. It was an allegation that we could not prove.

We continued in that vein until around lunch time. We convened for lunch approximately—I don't know. It would be a guess. An hour, an hour and 15 minutes, maybe 20 minutes. We came back. We started again on trying to get a mitigated penalty based on John's overall performance. We did not pull his records out. We thought the more we could lay in the background and try to argue it on the basis of John as a good worker; nonintent to injure somebody in throwing the lighter. It was not intentional to injure someone. We continued along those veins until well after the shift change. (Tr. 295–297).

At the conclusion of this meeting, Company officials still refused to change their decision. (Tr. 264, 298). Under the collective bargaining agreement, the Union had five days from the Company's answer at the third step to request arbitration. (Plaintiff's Exhibit 20). Union officials, however, requested an extension of the time limits for twenty or thirty days to further analyze the case, research similar cases that had been submitted to arbitration, and seek advice on the case from someone even more experienced in arbitration than Ned Davy. The Company agreed to allow the Union the additional time. (Tr. 265, 299, 338).

### F. *Mid July 1978: Meeting At UAW Regional Office With Assistant Regional Director William Osos*

The individual to whom Davy and the Local Union officials turned for further advice on the grievance was William Osos, Assistant Regional Director for Region 3 of the International Union, UAW. After Dallas Sells, the Regional Director, Osos is the highest ranking International Union official in UAW Region 3 which is composed of the states of Indiana and Kentucky. (Tr. 39–40). Evidence at trial revealed that he has extensive experience in the field of grievance handling and arbitration. He has been involved in grievance handling and arbitration proceedings since he was a local union official beginning in 1948. He has been on the Regional staff of the International Union since 1966, first as an International Representative between 1966 and 1973, and since 1973 as Assistant Regional Director. (Tr. 41–42). As an International Representative, Osos presented between ten and fifteen arbitration cases per year between 1966 and 1973, and since 1973 he has presented between thirty five and fifty arbitration cases per year as Assistant Regional Director. (Tr. 43).

Davy called Osos and set up an appointment to come to Indianapolis to discuss the Hardesty case with Delph and Loveless. The meeting was held sometime in the second or third week of July, before the UAW's annual summer school which began the last week in July.

At the meeting, Davy, Delph and Loveless presented the facts for Osos' consideration. As Osos explained at trial:

(Ned Davy) brought Alice Delph from the union and Calvin Loveless from the union, and he brought them into my office, and they brought me in the grievances that they had and explained to me what exactly had happened. And during the discussion, I was asking them, of course, basically when they told me the story, the first thing I asked was, "Well, was there any dispute between the facts?" My understanding was there was no dispute. Mr. Hardesty threw the lighter. He was sorry he threw it. He hit the guy in the eye, and the guy went to the hospital. There was no question of facts, and so all of my discussions went around, what happened in your plant? They told me about the thing in the rubber room, and my first question was, obviously, "Did anybody get caught?" Or "What would the company do?" "Well, they'll fire them, if they catch somebody."

The next thing that bothered me about the particular case was the fact that throwing a cigarette lighter with that great of force that hit the guy, put him into the hospital, and he got knocked down; this doesn't sound to me like the ordinary tossing in a barrel. And I told

the Local Union people that, and I'll have to say that Calvin and Alice were saying, "Well, what about, he didn't intend to do it?" "Well, this was what was happening in the rubber room." There were allegations of what was happening, but really we knew nothing about it other than these allegations. I looked at the case from that particular point of view. I said, "Number one, the fact is, there's an admission of guilt; so there isn't any question of the fact here. Nor would an ordinary person throw a cigarette lighter so hard that it would hit a person in the eye, put him in the hospital, and knock him down to put him in the hospital." It doesn't sound reasonable to me. I said, "I researched this thing before, but let me get—I'd have to have every arbitration case by BNA and all of the NLRB cases, which we have a library full of these, and we use them on a regular basis, and I looked up some cases that hit in the horseplay area. I remember, because that's where I was wondering whether it was going to fall in horseplay, and obviously, in looking the cases up—and I can't remember the cases today—I just remember that I found cases at that time, and from my prior experience in similar kinds of matters, that when an injury occurs, arbitrators are—they'll hold greater penalties when an admission is there and when there's no question of fact. They're very reluctant to overturn management decisions on penalties that are administered.

And finally, in the final analysis I said, "I don't believe we can win the grievance. I'll not arbitrate it, nor will Ned." (Tr. 44–46).

Based on this review of the grievance, Delph, Loveless and Davy concurred in the decision not to arbitrate the grievance. Therefore, no request for arbitration was made within the agreed upon extension of time, and the grievance was terminated in late July, 1978. (Tr. 266, 301).

### G. Subsequent Union Efforts On Hardesty's Behalf

Although they had concluded that they could not win Hardesty's grievance in arbitration and therefore declined to process it to arbitration, Union officials still did not abandon their efforts on his behalf. Thus, Delph and Loveless lobbied informally with plant manager Garrison outside the grievance procedure to have Hardesty reinstated. As Loveless explained, they "got the knee pads out" and pleaded with Garrison to bring Hardesty back. (Tr. 266). Company officials refused.

Moreover, in September 1979, at the request of plaintiff's counsel, Ned Davy met with Company officials to again attempt to persuade them to put Hardesty back to work, but they again refused, maintaining that he had been discharged for just cause. (Tr. 301–302).

By the time of these meetings, the grievance procedure had been terminated for fourteen months, and Davy was under no legal obligation to take these steps; yet, he did because he wanted to help Hardesty if he could. (Tr. 303).

## I.

### A. This Action Is Barred By The Applicable Ninety-Day Statute of Limitations

Plaintiff's suit against Essex and the Union defendants is brought under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Plaintiff alleges that Essex breached the collective bargaining agreement by discharging him and that the Union defendants breached their duty of fair representation by the manner in which they processed his grievance.

Since Congress has not enacted a specific statute of limitations governing § 301 actions, the "timeliness of a Section 301 suit.... is to be determined, as a matter of federal law, by reference to the appropriate state statute of limitations." *International Union, UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 704–705, 86 S.Ct. 1107, 1112–1113, 16 L.Ed.2d 192 (1966). The determination of the most appropriate state limitations period "depends upon an

examination of the nature of the federal claim and the federal policies involved." *United Parcel Service v. Mitchell,* 451 U.S. 56, 61, 101 S.Ct. 1559, 1563, 67 L.Ed.2d 732, 739 (1981).

In *Mitchell,* the Court reversed a decision of the Second Circuit which had held that New York's six (6) year statute of limitations for actions alleging breach of contract applied where an employee brought a § 301 action alleging wrongful discharge and breach of the Union's duty of fair representation. In that case, plaintiff's discharge had been upheld by a joint company and union grievance committee. The Supreme Court determined that New York's ninety (90) day limit on actions seeking to vacate an arbitration award was the proper state limitations period to be applied.

*Mitchell* holds that a suit brought under § 301 can most closely be analogized to an action to vacate an arbitration award because the aggrieved employee must first establish a flaw in the binding grievance procedure before being entitled to reach the merits of his alleged contract claim. *United Parcel Service v. Mitchell, supra* 451 U.S. at 740, 101 S.Ct. at 1564. Moreover, the Court reasoned in *Mitchell* that a short state limitations period for matters involving binding grievance-arbitration procedures fosters the important federal policy of rapidly resolving labor disputes. *Id.* at 740–741, 101 S.Ct. at 1564–1565.

Following the reasoning underlying the *Mitchell* decision, the Seventh Circuit, in *Davidson v. Roadway Express, Inc.,* 650 F.2d 902 (7th Cir. 1981), held that Indiana's ninety (90) day limitations period on actions to vacate an arbitration award, I.C. 34–4–2–13, applied to an employee's § 301 action to challenge the results of a final and binding joint grievance committee decision upholding his discharge.

Even closer on point is the recent decision of the U.S. District Court for the Northern District of Illinois in *Bigbie v. Local 142, International Brotherhood of Teamsters,* 530 F.Supp. 402 (N.D.Ill.1981). The Court in *Bigbie* held that Indiana's ninety (90) day limitations period for vacating an arbitra-

tion award is the appropriate state statute of limitations for *any* action by an aggrieved employee against his union for alleged breach of its duty of fair representation in handling an employee's grievance, whether the grievance was arbitrated or was disposed of in an earlier step of the grievance procedure. In the words of the Court:

> Under (the *Mitchell* ) analysis it is quite irrelevant at what point in the contractual grievance procedure Union's breach of its duty of fair representation has occurred. Whether Union has failed to file any grievance at all (as alleged here) or has failed to represent the employee fairly before the grievance committee (as in *Davidson* ) or has failed to appeal from an adverse arbitration decision (as in *Mitchell* ) has no significance in relation to the substance of a Section 301 claim: whether Union has breached its duty of fair representation. From the employee's viewpoint a union's refusal to launch the grievance procedure is just as "final and binding" as refusal to carry forward a grievance at any point after the procedure has been invoked. What is significant in each situation is that the *Mitchell* Court chose to analogize the action to one vacating an arbitration award, rather than applying the statute of limitations for an action enforcing a written or oral contract. It would be absurd to have a 90-day limitation period in one such situation and a five-year period in another representing the other side of the same coin. (Memorandum Decision, pp. 5–6)

*Accord, Fields v. Babcock And Wilcox,* F.Supp., 108 LRRM 3150 (W.D.Pa.1981).

Applying similar reasoning, a Maryland district court applied Maryland's thirty-day limitation period for setting aside an arbitration award to a suit brought under § 301 and alleging breach of the union's duty of fair representation. *Ross v. Bethlehem Steel Corp.,* F.Supp., 109 LRRM 2791 (D.Md.1981). That Court held that the special statute of limitations for vacating arbitration awards applied to any *final and binding* resolution in a grievance procedure and, specifically applying it to the facts of

that case, to a union's action declining to appeal a grievance from the second to third step of the procedure. Thus the court found:

No appeal can be taken to Step 3 unless the Union pursues the appeal. * * * The plaintiff received the Union's final decision not to appeal his grievance from the Grievance Committee in August, 1980. Plaintiff was aware at that time, that no further action would be taken in his case. Therefore, in 30 days the Step 2 decision against the plaintiff became final and binding within the meaning of the collective bargaining agreement.

109 LRRM at 2792. The Court concluded that the plaintiff's suit was barred because he did not file it within thirty days after the second-step resolution became final and binding.

▮ The facts of this case are strikingly similar to the facts in *Ross*. Here the Union and Company held their final third step meeting on June 30, 1978. Under the collective bargaining agreement, the Union had five days to appeal the Company's third step denial of the grievance to arbitration. (Article VI, Section 2 Collective Bargaining Agreement, Plaintiff's Exhibit 20). The Union requested and was granted an additional twenty or thirty days to appeal. During that time, the Union further reviewed and researched the grievance and decided not to appeal it to arbitration. Accordingly, they permitted the time limit for appeal to expire. Upon the expiration of the time for the appeal in July, 1978, the Company's third step denial automatically became, by the terms of the collective bargaining agreement, the final and binding resolution of plaintiff's grievance. (*Id.*, Article VI, Section 6). Yet plaintiff did not file his complaint in this action until September 25, 1979, some fourteen months later. Thus the suit was filed well outside the applicable ninety-day limitations period.

Plaintiff seeks to avoid the effect of the ninety-day statute of limitations by his testimony that he did not know of the disposition of his grievance until September, 1979. Such testimony is incredible. An examina-

tion of the terms of the grievance procedure itself indicates that the time limits for appealing a grievance through the three steps to arbitration are very short. Plaintiff, as an employee subject to the terms of the Agreement, can fairly be charged with knowledge of its terms. *See Newgent v. Modine Manufacturing Co.*, 495 F.2d 919 (7th Cir. 1974). This is even more so once plaintiff has retained the services of able counsel.

The evidence at trial establishes that plaintiff's counsel began investigating the case as early as February, 1979. (Plaintiff's Exhibit 14). At that time he began taking statements from witnesses. Plaintiff testified that he retained counsel on April 5, 1979. (Tr. 179). Significantly, there was no testimony that either the union or the company ever misinformed plaintiff as to the status of his grievance. Instead he waited seven months after beginning his investigation to commence suit against these defendants. Even according plaintiff ample time to determine the final decision on his grievance with the assistance of counsel, the complaint was filed well outside the statutory ninety-day period.

▮ Plaintiff's counsel has also suggested that the grievance procedure was somehow revived by informal discussions on plaintiff's grievance initiated by International Representative Ned Davy at the request of plaintiff's counsel in September, 1979. Yet these discussions were held on an informal basis as a courtesy to plaintiff and could not by the terms of the collective bargaining agreement revive a grievance that had long since become final. To permit such informal action to toll the statute of limitations after it has expired would totally violate the statute's effect. Thus a plaintiff could request at anytime even years later reconsideration of a final grievance resolution and a union would lose the protection of the statute merely by agreeing to assist the plaintiff. Nothing in the equitable doctrine of tolling supports such a result. *See Kaletha v. Bortz Elevator Company, Inc.*, 383 N.E.2d 1071 (1978).

Finally, plaintiff contends that the doctrine requiring the exhaustion of internal union remedies which prevailed in this Circuit until the Supreme Court's decision in *Clayton v. ITT Gilfillian,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981) precludes the application of the 90 day statute of limitations because he could not be expected to file suit within this period if he was required to exhaust internal union remedies. If plaintiff had attempted to exhaust his internal union remedies he would have a good argument because the statute would presumably be tolled by his efforts. But plaintiff failed to exhaust or even to attempt to exhaust and for this reason his action against Union defendants was initially dismissed and then reinstated after the *Clayton* decision. Thus, he took no steps that would toll the statute under this theory. He neither attempted to exhaust nor filed suit within the limitations period.

The decision on Hardesty's grievance was final in July, 1978, and the conduct by Union defendants of which plaintiff now complains occurred in the course of its representation of plaintiff in the contractual proceedings. Therefore, his failure to file this action against Union defendants within ninety days of the final termination of grievance procedures on his behalf, or at least within ninety days after retaining competent counsel, bars his suit against Union defendants.

## II.

A union, as exclusive bargaining representative responsible for the presentation of employee grievances to management, has a duty to fairly represent all employees in the unit it represents. This duty is breached "only when the union's conduct toward a member of the bargaining unit is arbitrary, discriminatory or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967).

The duty to fairly represent employees does not require a union to win every grievance or to take every grievance to arbitration. As the Supreme Court emphasized in *Vaca,* a union has the duty to make deter-

minations as to the merits of each grievance and the likelihood of success at arbitration in order to preserve the integrity of the grievance-arbitration procedure. The *Vaca* court held, as a corollary to this principle, that courts will not second-guess the union's evaluation of the merits of a grievance absent direct evidence of hostility or bad faith. *Vaca v. Sipes,* 386 U.S. at 191–192, 87 S.Ct. at 917–918.

Thus, it is not sufficient in this case for plaintiff merely to assert that the union's assessment of the merits of plaintiff's grievance was erroneous. *See Pfefferkorn v. Borden, Inc.,* 106 LRRM 2036 (N.D.Ind. 1980); *Blevins v. General Electric Co.,* 491 F.Supp. 521 (W.D.Va.1980). Nor is it sufficient to establish that the union negligently failed to investigate or assert a certain defense in plaintiff's behalf. *Cannon v. Consolidated Freightways Corp.,* 524 F.2d 290 (7th Cir. 1975).

The essential element of a breach of a union's duty of fair representation is intentional wrongful conduct directed at the plaintiff. Thus, to recover against Union defendants, plaintiff must submit "substantial evidence of fraud, deceitful action or dishonest conduct." *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); *Humphrey v. Moore,* 375 U.S. 335, 348, 84 S.Ct. 363, 371, 11 L.Ed.2d 370 (1964). As the Seventh Circuit recently reemphasized in *Hoffman v. Lonza, Inc.,* 658 F.2d 519 (7th Cir. 1981):

> The remedy for a failure to represent "carries with it the need to adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives (citing *Motor Coach Employees v. Lockridge, supra* )

658 F.2d at 521. This is the current last word from this circuit on this subject. In this connection, the Seventh Circuit cautions that courts must strictly maintain the distinction between "honest, mistaken conduct on the one hand and irrational treatment on the other." *Id.* The court emphasized the need for proof of intentional wrongful conduct by the union, stating:

The legal action based on the Union's duty to fairly represent might be more properly labeled as an action for the union intentionally causing harm to an employee in a grievance proceeding.

Accordingly, plaintiff could recover from Union defendants in this case only if he proved that the Unions' decision not to pursue his grievance to arbitration was based not on an evaluation of the merits of the grievance but rather on intentional, wrongful and invidious considerations unrelated to the Unions' responsibilities in the grievance procedure. This he has not done.

To the contrary, the evidence in the record demonstrates that the grievance protesting plaintiff's discharge received exemplary attention and handling by union defendants. The unrefuted evidence of record shows that from the meeting on June 23, 1978, at which the Company's decision to discharge was announced, through the third step meeting on June 30, 1978, Union officials vigorously attempted to persuade the Company to reinstate plaintiff.

Plaintiff was present at the June 23 meeting and, by his own admission, witnessed the attempts of union officials Delph and Phipps to persuade the Company not to terminate him. (Tr. 117). The Local Union's efforts were renewed by Delph and Calvin Loveless at the meeting on June 27. When they were unsuccessful at that meeting, they adjourned the discussion until International Representative Ned Davy and Company attorney Wib Swick could be present. These two individuals attended the June 30 meeting where the discussion of plaintiff's discharge consumed most of the day. Thus within a period of a week, between Friday June 23 and Friday June 30, four officials of the Union defendants spent many hours attempting to save plaintiff's job.

■ Unable to negotiate plaintiff's reinstatement in the grievance procedure, Union defendants were put to the decision of whether to arbitrate the grievance. The power and responsibility of a union to make this difficult decision on each grievance is a necessary part of its role as the representative of employees in the administration of the collective bargaining agreement. While the individual employee will always wish for his grievance to proceed to arbitration, the union has no duty to satisfy that wish. *Vaca v. Sipes, supra.*

> If the individual employee could compel arbitration of his grievance regardless of its merits, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.

*Vaca v. Sipes,* 386 U.S. at 191–92, 87 S.Ct. at 917–918. As part of its responsibility to evaluate grievances in good faith on their merits, the union must have the right to sometimes make an erroneous evaluation.

> For if a union's decision that a particular grievance lacks sufficient merit to justify arbitration would constitute a breach of the duty of fair representation because a judge or jury later found the grievance meritorious, the union's incentive to settle such grievances short of arbitration would be seriously reduced.

*Vaca v. Sipes,* 386 U.S. at 192–93, 87 S.Ct. at 918–919. Thus in evaluating the unions decision not to arbitrate plaintiff's grievance in this case, the focus is on the manner in which the decision was made and not on a hindsight determination of the correctness of that decision.

The evidence at trial showed that the union took a reasoned and conscientious approach in deciding not to arbitrate plaintiff's grievance. First, Davy researched the issue in the authoritative work *How Arbi-*

*tration Works* *, third edition, by Elkouri and Elkouri. On the basis of this research, he concluded that the chances of success in arbitration were remote. (Tr. 299).

Still, he did not let the matter drop and decided instead to seek the advice of William Osos, Assistant Regional Director of UAW Region 3, who has extensive experience in arbitration. At a meeting in Indianapolis in mid-July, Davy, Delph and Loveless reviewed the case with Osos. As Hardesty's admission that the lighter he threw hit Keller foreclosed an argument on the facts, Osos considered the two defenses available to present to an arbitrator: that Hardesty had been subject to disparate treatment because other employees who had thrown object in the plant had not been discharged, and that the penalty of discharge was too severe because Hardesty did not intend the consequences of his act.

Osos concluded that the first defense was insufficient because there was no evidence that the Company had ever caught other employees throwing things in the plant and no evidence that any one had ever been hurt by an object thrown by another employee. He concluded that the second defense was likewise insufficient because the cases he found dealing with horseplay demonstrated a pattern of arbitrators upholding severe discipline, including discharge, where misconduct results in personal injury. In addition, from his own arbitration experience, Osos realized that where the facts are not in dispute, arbitrators are "very reluctant to overturn management decisions on penalties that are administered." (Tr. 46). On the basis of this analysis, Osos too concluded that there was an insufficient chance of success to warrant arbitration, and the others concurred.

■ Whether Osos was correct in his analysis and conclusion is not at issue. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Freeman v. O'Neal Steel, Inc.,* 609 F.2d 1123 (5th Cir.1980). What is significant is that he based his decision on his evaluation of the merits of the grievance, and that is all the duty of fair representation requires. Osos' analysis is consistent with the reported arbitration cases. Thus, the following reported cases demonstrate that arbitrators are likely to uphold discharges where an employee's conduct results in, or creates a serious risk of, personal injury: *Libby, McNeil & Libby,* 53 LA 188 (Larkin, 1969); *Johns-Manville Fiber Glass, Inc.* 48 LA 993 (Crawford, 1967); *Decar Plastics Corp.,* 44 LA 921 (Greenwald, 1965); *Geigy Chemical Corp.,* 33 LA 819 (Murphy, 1959). In addition, the following discussion from a decision by the noted arbitrator Whitley P. McCoy demonstrates the proposition that arbitrators are reluctant to interfere with management decisions regarding the severity of discipline, assuming that the facts are clear:

It is primarily the function of management to decide upon the proper penalty. If management acts in good faith upon a fair investigation and fixes a penalty not inconsistent with that imposed in other like cases, an arbitrator should not disturb it. The mere fact that management has imposed a somewhat different penalty or a somewhat more severe penalty than the arbitrator would have, if he had had the decision to make originally, is no justification for changing it. The minds of equally reasonable men differ. A consideration which highly aggravates an offense in one man's eyes may be only slight aggravation to another. If an arbitrator could substitute his judgment and discretion for the judgment and discretion honestly exercised by management, then the functions of management would have been abdicated, and unions would take every case to arbitration. The result would be as intolerable to employees as to management. The only circumstances under which a penalty imposed by management can be rightfully set aside by an arbitrator are those where discrimination, unfairness, or capricious

---

* At Tr. 299, the name of this book is mistranscribed as "Law Arbitration Works, the Third Division."

and arbitrary action are proved—in other words, where there has been abuse of discretion.

*Stockham Pipe Fittings, Co.,* 1 LA 160, 162 (1945). See also, *Libby, McNeil & Libby,* supra at 190 where another noted arbitrator, John Day Larkin, stated:

> Most arbitrators agree that, where there is no clear showing that the Company acted arbitrarily, discriminatorily, prejudicially or with bias, management's position should be sustained in matters of discipline.

Thus, the evidence shows that the decision not to arbitrate Hardesty's grievance was made only after the grievance received serious attention by an individual with extensive experience in the field of arbitration who based his decision on that experience and on research directly related to Hardesty's case. Osos did not know Hardesty; Davy did not know Hardesty. Neither of them had any reason to harbor ill will towards him or to want to injure him. The decision not to arbitrate was based solely on a careful evaluation of the merits of the grievance.

Plaintiff attempted to construct his case against Union defendants around two themes: first, that the Union decision-makers did not sufficiently investigate the facts of the case; second, that the decision not to arbitrate his grievance was somehow tied up in an internal union political fight between Alice Delph and Homer Phipps. Counsel also attempted to prove that the union had attempted in some way to conceal their actions from the plaintiff. None of these arguments has merit.

### Investigation of the Grievance

 With respect to the Union's investigation, plaintiff's counsel, particularly on cross-examination of Union defendants' witnesses attempted to suggest that there was some significance to the following: no Union official visited Keller in the hospital to obtain his version of the incident, no Union official drew a diagram of the scene of the incident; no Union official measured the distance or angles involved; Calvin Loveless did not obtain a first hand account of the incident from Keller or Hardesty.** Ned Davy did not obtain a first hand account from Keller or Hardesty and was not familiar with the scene of the incident; Bill Osos did not know how much a disposable cigarette lighter weighs, etc.

The intended implication, of course, is that if the Union officials did not investigate those issues, they could not have made a proper decision on the merits of the grievance. What the argument ignores, however, is that the only purpose for such an investigation would be to ascertain the essential facts of the incident. Factually, there were two significant issues that an investigation might address: whether the lighter Hardesty threw hit Keller; and, if so, did Hardesty intend to hit Keller. An investigation was not necessary to answer these questions. Every one—Company and Union officials alike—already knew the answers because Hardesty himself stated that he threw the lighter, it hit Keller, and he did not intend to hit Keller.

Plaintiff, of course, now denies that he told anyone that the lighter he threw hit Keller and attempts to suggest that it did not. By his own words, in the affidavit he gave to the National Labor Relations Board, "The lighter hit Keller in the eye." (Defendants' Exhibit K). Moreover, he admitted this at both the June 21 and June 23 meetings (Tr. 258, 332, 336).

Given this admission, any attempt by the Union to suggest that Hardesty was not responsible would have been fruitless. Hardesty was the best witness to the incident and the Union relied on his account of it. Accordingly, Union defendants' failure to undertake the type of investigation plaintiff now suggests was necessary is wholly without legal significance. Moreover, even where a union fails to conduct an investigation which might have been helpful, courts have ruled that this failure is

** Loveless testified that he did speak to Bill Pence, another eye witness. Both Delph and Homer Phipps spoke to Hardesty. Davy testified that he always relies on his local committee to conduct investigations and take the facts as they are presented to him. (Tr. 258, 310).

merely an exercise of negligence or poor judgment which does not constitute a breach of its duty. See *Cannon v. Consolidated Freightways Corp.,* 524 F.2d 290 (7th Cir.1975).

*Local Union Politics*

■■ Plaintiff's second argument, that the decision not to arbitrate his grievance was somehow related to Local Union politics, is similarly without merit. The evidence demonstrated that the lead Union decision-makers were William Osos and Ned Davy, officials of the International Union, who were in no way involved in Local Union politics. Thus, whatever those politics were, they had no impact on the decision that was made on Hardesty's grievance.

This Court takes very lightly the attempt by plaintiff to inject local union politics into this case. Such is much ado about very little.

The unrefuted evidence of record demonstrates that the individuals who took the lead in the decision-making process were independent of any Local Union politics. Moreover, even though there was some testimony about the Local Union's politics, there was no credible testimony tying those politics to the decision on Hardesty's grievance. Hardesty claimed that he told Alice Delph that he was supporting Homer Phipps against Delph in the election for Local Union president. (Tr. 115). The attempted implication is that because Hardesty was supporting Delph's opponent for union officer, Delph had reason to be hostile to Hardesty and not handle his grievance fairly. The argument fails, however, because it is based on a misconstruction of the facts: Delph did not run against Phipps in the election. An employee named Joe Lord did. (Tr. 237, 255–256). Thus, Hardesty's testimony on this issue fails in its purpose and serves only to undermine his own credibility.

Other evidence relating to Union politics was offered through Homer Phipps who testified that he had problems obtaining union records from Delph after he became president. The evidence shows, however, that whatever difficulties Phipps had with

Delph, those difficulties had no bearing on the decision not to arbitrate Hardesty's grievance. First, Phipps' testimony dealt primarily with events in late 1978 and 1979, but the decision on Hardesty's grievance was made in July 1978. Evidence from a period after the decision was made is simply not relevant to the issue of the Union's performance of its duty of fair representation. *Freeman v. O'Neal Steel, Inc.,* 609 F.2d 1123 (5th Cir.1980); *Whitten v. Anchor Motor Freight,* 521 F.2d 1335 (6th Cir.1975).

In addition, the records that Phipps sought were not related to Hardesty's grievance. Phipps testified that he had a copy of the grievance records on Hardesty's case throughout. (Tr. 237). While any of Delph's personal notes from grievance meetings were destroyed in a fire, Loveless was, at the time of trial, still in possession of his notes and reviewed them before testifying. (Tr. 257). The fact that Loveless had notes from the grievance meetings was revealed to plaintiff in Union defendants' answer to plaintiff's interrogatory number 6f, served on plaintiff's counsel in May 1980, but plaintiff never requested copies. Moreover, Davy testified that the handling of Hardesty's grievance was in no way affected by the condition of the Union's records. (Tr. 320).

Finally, plaintiff claims that the Local Union's political disputes prevented him from learning the status of his grievance. As was argued above, his testimony on this issue is incredible. However, even assuming *arguendo* that he was not advised of the status of the grievance, the Union's failure to advise him is not a breach of the duty of fair representation. As the Court in *Whitten v. Anchor Motor Freight,* 521 F.2d 1335 (6th Cir.1975) noted on this very issue:

> The Union may have acted negligently or exercised poor judgment in failing to keep Whitten informed of the status of his grievance, but this is not sufficient to support a claim of unfair representation.

Plaintiff, therefore, failed to adduce any evidence that would demonstrate that the decision on his grievance was improperly motivated. In the absence of such evi-

dence, there can be no finding that the Union defendants breached the duty of fair representation.

In *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court firmly established that contractual back pay damages cannot be assessed against a union defendant in a breach of the duty of fair representation action over a union's failure to process an employee's grievance. Faced squarely with the question of whether an award against a union could include damages attributable solely to an employer's breach of contract, the Court clearly answered that it could not, stating:

> (T)hough the union has violated a statutory duty in failing to press the grievance, it is the employer's unrelated breach of contract which triggered the controversy and which caused this portion for the employee's damages ... with the employee assured of direct recovery from the employer, we see no merit in requiring the union to pay the employer's share of the damages.

*Vaca v. Sipes,* 386 U.S. at 197, 87 S.Ct. at 920 (footnote omitted). When a union plays no part in an employer's wrongful discharge of an employee, the union cannot be held jointly liable for any back pay award. *Vaca v. Sipes,* 386 U.S. at 198 n. 18, 87 S.Ct. at 921 n. 18.

In *Czosek v. O'Mara,* 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), the point was made even plainer:

> Assuming a wrongful discharge by the employer independent of any discriminatory conduct by the union and a subsequent discriminatory refusal by the union to process grievances based on the discharge, *damages against the union for loss of employment are unrecoverable* except to the extent that its refusal to handle the grievances added to the *difficulty and expense* of collecting from the employer.

397 U.S. at 29, 90 S.Ct. at 773 (emphasis added) Union defendants' liability in this case, then, can only be for plaintiff's "difficulty and expense" in pursuing his § 301 remedy against Essex—damages which, as a general matter of contract law, are not recoverable from an employer.

This standard, of course, makes sense if one considers the legal theory of the duty of fair representation. The union itself is not the obligor of any contractual duty running to the employees. The employer, not the union, is their obligor. The union is on the employee's side of a labor contract. The union cannot discharge, so it cannot promise that discharges will only be for "just cause." The union's duty is statutory, not contractual. Therefore, contractual liability for a wrongful discharge cannot be shifted from the employer to the union. Rather, the union can only be held liable for the non-contractual "expenses" incurred by plaintiff in collecting from his employer.

*Vaca v. Sipes, supra,* enunciates the appropriate method of apportioning liability between employers and unions in employee actions for breach of contract and breach of the duty of fair representation. In *Vaca* the Court definitively held that:

> The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer. In this case, even if the Union had breached its duty, all or almost all of Owens' damages would still be attributable to his allegedly wrongful discharge by Swift. For these reasons, even if the Union here had properly been found liable for a breach of duty, it is clear that the damage award was improper.

386 U.S. at 197–198, 87 S.Ct. at 920–921.

An excellent illustration of the *Vaca* apportionment of damage principle is *St. Clair v. International Brotherhood of Teamsters,* 422 F.2d 128 (6th Cir. 1969), in which the court discussed in detail the proper apportionment of damages between an employer wrongfully discharging an employee and a union failing to represent him fairly:

As the jury found, the union did not procure plaintiff's discharge. It was the decision of the employer (although the District Court seems not to have decided whether the company's act was wrongful)... The calculation of who caused which damages may present serious practical problems, but the Supreme Court has strongly implied that in cases like this, involving a discharge and an alleged failure by the union to take all available steps to remedy the employee's complaint, *the increment of damages caused by the union's breach of the duty is virtually de minimus.* "(A)ll or almost all of Owens' (the employee's) damages would still be attributable to his allegedly wrongful discharge by Swift (the company)." *Vaca v. Sipes,* 386 U.S. at 198, 87 S.Ct. at 921.

442 F.2d at 132 (emphasis added): *Accord Milstead v. IBT Local 957,* 580 F.2d 232 (6th Cir. 1978).

■ In short, those damages, including back pay, that flow directly from an employer's wrongful discharge are assessable only against the employer and not against a union defendant. A union is properly chargeable only with those items of damages, usually *de minimis,* that flow solely from its breach of the duty of fair representation.

In *Alyeska Pipeline Services Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court reaffirmed the traditional American rule that attorney fees are not recoverable by the prevailing party in federal litigation in the absence of statutory authorization. No federal statute provides for the recovery of attorneys fees against a union defendant by a prevailing plaintiff in a breach of the duty of fair representation action.

■ Some courts have held that a union may be liable, as an element of compensatory damages, for that portion of plaintiff's attorney fees required to prosecute his case against the employer. *See e.g. Scott v. IBT, Local 377,* 548 F.2d 1244 (6th Cir.1977); *Self v. Drivers, Chauffeurs, Warehousemen and Helpers Local Union No. 61,* 620 F.2d 439 (4th Cir.1980).

However, even these cases make it clear that fees cannot be awarded against a union for the prosecution of *other* portions of the case. In *Scott,* the court explicitly held that the award of attorney fees against the union cannot include attorney fees incurred by a plaintiff in prosecuting his breach of the duty of fair representation claims:

To have awarded *Scott* his attorney fees against Anchor Motor Freight would have been in violation of the American rule as set forth in *Alyeska.* A different situation is presented, however, in his action against the Union, for in that action the principal element of *Scott's* damages is the amount which it cost him in attorney fees and other expenses to do that which the union was obliged but failed to do on his behalf. *He was, therefore, entitled to include in his damages against the Union the amount which he reasonably expended in attorney fees and other costs in prosecuting his claim against the company,* costs which he would not have incurred but for the Union's breach of its duty to represent him fairly and in good faith.

548 F.2d at 1246 (citations omitted) (emphasis added)

Attorney's fees attributable to plaintiff's case against union defendants are *not* damages under the *Scott* rationale. They are not part of the "difficulty and expense of collecting from the employer." *Czosek v. O'Mara, supra* 397 U.S. at 30, 90 S.Ct. at 773.

Consequential damages sustained as a secondary result of the union's failure to process an employee's grievance are generally not awarded. *St. Clair v. International Brotherhood of Teamsters, Local 515, supra* at 128. Damages for mental suffering have been assessed against a union defendant, where actually injury has been established, only in exceptional case marked by extreme and malicious mistreatment of an employee by his union. *See e.g. Richardson v. Communications Workers Of America,* 443 F.2d 974 (8th Cir.1971), cert. den. 414 U.S. 818, 94

S.Ct. 38, 38 L.Ed.2d 50 (1973); *Farmer v. Hotel Workers, Local 1064,* 99 LRRM 2166 (E.D.Mich.1978). In *Richardson,* for example, the non-union grievant was subjected to many months of constant verbal and serious physical abuse. No evidence in the record suggests that Hardesty suffered through a similar reign of terror. As was recognized by the First Circuit in *Segarra v. Sea-Land Service, Inc.,* 581 F.2d 291 (1st Cir. 1978):

> Not every default by the union that constitutes a breach of its duty of fair representation necessarily amounts to that aggravated conduct for which mental distress... may be awarded.

581 F.2d at 298.

Thus, even if Hardesty should prevail in his action for breach of the duty of fair representation and be able to prove actual injury, compensatory damages for such mental suffering cannot properly be awarded against union defendants since they did not participate in Essex's alleged wrongful discharge of plaintiff nor maliciously mistreat him. Any consequential damages for mental anguish sustained by plaintiff flow directly from the employer's alleged breach of contract and, therefore, must be born solely by Essex.

### III.

■ For an employee to succeed in an action against his former employer for wrongful discharge, he must not only prove the employer breached the collective bargaining agreement, but must also prove that the "union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance." *Vaca v. Sipes,* 386 U.S. 171 at 186, 87 S.Ct. 903 at 914, 17 L.Ed.2d 842 at 855 (1967). The Seventh Circuit has adopted this approach, requiring proof by plaintiff of the union's failure to fairly represent him before reaching his claim against the employer. *Baker v. Amsted Industries,* 656 F.2d 1245 (7th Cir.1981); *Melendy v. U.S. Postal Service,* 589 F.2d 256 (7th Cir.1978); *Cannon v. Consolidated Freightways Corp.,* 524 F.2d 290 (7th Cir.1975); see also, *Hines v.*

*Anchor Motor Freight,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). In this case, the Union decided not to carry the matter to arbitration. In such cases, the "union decision not to carry the matter to arbitration insulates the company from liability unless the union breached its duty of fair representation." *Pfefferkorn v. Borden, Inc.,* 106 LRRM 2036, 2038 (N.D.Ind. 1980).

### IV.

■ Plaintiff claims his discharge violated the collective bargaining agreement, apparently contending, since there was no posted safety rule concerning the throwing of objects, voila!, plaintiff cannot be discharged for throwing an object. His approach misconceives the basis of his discharge, which was not for violating an unpublished work rule. He was discharged for carelessly throwing a lighter in conscious disregard for the safety of others which resulted in serious bodily harm to his fellow employee, requiring that employee's hospitalization.

Under the collective bargaining agreement in effect between Essex and Local 1497, the Management Rights Clause provided, inter alia:

> Any right permitted to Management by law and not otherwise forbidden by this contract shall, for the duration hereof, be administered by the Company. (Article II)

Among the various rights reserved to management is the right to maintain a safe establishment. An employer has not only the right but the responsibility to develop and maintain a safe and healthy environment for its employees. This duty arises by statute as well as from common law. 29 U.S.C. § 654(a)(1) states: "Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." Conversely, "Employees have an inherent obligation to protect their own safety and to cooperate in promoting safety." Elkouri &

Elkouri, *How Arbitration Works,* Third Ed., BNA, 1981 at 669.

■ Plaintiff's disregard for others and breach of his obligation to act in a safe manner constituted "just and reasonable cause" for his discharge within the meaning of Section 7(c) of Article VI of the collective bargaining agreement. While plaintiff did not intend to injure Keller when he threw the lighter, there can be no doubt that plaintiff's conduct was careless and in conscious disregard for the safety of others. Wib Swick, Essex corporate representative, actually took time out of the Step 3 meeting of June 30th to step off the distance from where Hardesty threw the lighter to where Keller was hit, such distance measuring 60 feet. (Tr. 60). Hardesty threw the lighter with sufficient force to travel the 60 feet and still seriously injure Ray Keller. In fact, Keller still suffers from the injury with a dilated eye and increased risk of glaucoma requiring annual checkups. (Tr. 70).

In determining whether just cause exists, the Seventh Circuit examines the various employer interests at stake, including the concern over job safety, employee discipline and employee morale. *Scott v. The Riley Company,* 645 F.2d 565 at 568 (7th Cir. 1981); *S.J. Groves & Sons v. Int'l Brotherhood of Teamsters,* 581 F.2d 1241, at 1245, (7th Cir.1978). The evidence adduced at trial established that hourly employees were throwing pieces of rubber and other objects prior to Hardesty's discharge, but none had been caught and no injuries had been reported to supervision. There was testimony that one assistant foreman, Alvin Collingsworth, was throwing objects prior to June of 1978. (Tr. 187). However, it was later established that Mr. Collingsworth began as an hourly employee and did not move to supervision until August of 1978—two months after Hardesty's discharge. (Tr. 327).

Employees have a right to expect a safe workplace and the knowledge that other employees may throw objects long distances, potentially injuring co-workers, seriously undermines employee morale and the integrity of management. In order to maintain employee discipline and morale, and because there was no dispute that Hardesty seriously injured a fellow employee by his careless act, it was incumbent upon Essex to discipline him in a manner not inconsistent with the contract.

■ Review by courts of a company's decision to discharge for just cause is done on a case-by-case basis. *Scott, supra; Groves, supra.* Although past arbitral decisions are not determinative as to whether just cause exists, they are helpful in the court's deliberation. *Scott, supra,* at 2220; *Groves, supra,* at 1245. In *Hess Oil Virgin Islands Corp.,* 72 LA 81, it was determined that an employer had just cause to discharge an employee for gross negligence where the employee panicked and failed to shut off a valve, thus causing an explosion which resulted in considerable damage to equipment. As Arbitrator Berkman stated:

The grievant's failure to adhere to the simple safety procedures in this case resulted in extensive damage to the charge heater *and perhaps more important, potential harm to fellow employees.* Under the circumstances of this case, the Arbitrator believes that the grievant was guilty of gross negligence and/or gross incompetence and that therefore the discharge was justified. 72 LA 83 (emphasis added).

*Hess* is similar to the case at bar in that both cases involve serious careless conduct on the part of the grievant. *Hess* clearly shows that such conduct constitutes just cause for discharge. The major difference between the two cases is that in *Hess* only equipment was damaged, while here the injury was to the eye of an employee.

In *J.R. Simplot Co.,* 67 LA 645, an employee discharge was upheld for bringing a snake into a working area. The snake was seen by a fellow employee who had a great fear of snakes and also a heart condition. As Arbitrator Wiggins concluded:

It is not enough to say that no actual injury or harm occurred, referred to B_____'s testimony that he experienced no heart palpitations. It is impossible for

anyone to say that B——— suffered no damage whatsoever from the incident, even though there were no apparent physical manifestations at the time.

More important is the real potential that B——— could have suffered a serious or possibly fatal heart attack from the unexpected sight of the snake occurring, as it did, at a busy work location which is possibly the last place an individual frightened of snakes would expect to encounter one. It was fortuitous that the more serious consequences did not occur since, otherwise, in addition to the remorse and contriteness which would have been experienced by all concerned, both S——— and the Company could have faced liability claims. 67 LA 653.

In contrast to *Simplot,* the careless behavior on the part of the plaintiff actually resulted in permanent injury to a fellow employee.

Other sources of assistance to the court in determining whether just cause existed are the findings of the Indiana Unemployment Security Division Appeals Referee as to Hardesty's eligibility for unemployment compensation benefits and the Regional Director's findings as to Hardesty's charge before the National Labor Relations Board. Both the Indiana Unemployment Compensation Appeals Referee and the Regional Director of the National Labor Relations Board found that Essex had just cause to terminate Hardesty. State and federal agency determinations that just cause existed to discharge Hardesty are not res judicata. *Smith v. Local No. 25,* 500 F.2d 741, 748, n. 4 (5th Cir.1974). However, express findings by such agencies are not to be ignored and, absent evidence to the contrary, should be given considerable weight. *Id.* This is particularly so in this case, where the Unemployment Compensation Boards' primary function is to determine whether just cause exists for discharge. The state agency found not only that Hardesty hit Keller in the eye with the lighter, but concluded that he "was discharged from his employment for just cause, as claimant's [Hardesty's] conduct endangered the safety of co-workers." (Defendant Ex. G). The Regional Director of the N.L.R.B., in his summary report, found that Hardesty was not discharged for engaging in legally protected activities and that "the employer [Essex] proffered reasonable cause for the discharge", e.g., discharge for causing serious injury to Keller. (Defendant Ex. F).

Based upon the above, it is readily apparent that Essex had just and reasonable cause to terminate the plaintiff for carelessly causing serious injury to a fellow employee. Under the circumstances of this case, it is clear that the plaintiff was discharged for just cause under the collective bargaining agreement and Essex is, therefore, entitled to a judgment in its favor.

### JUDGMENT

Judgment shall enter in favor of all defendants and against the plaintiff. Each party will bear its own costs.