## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## J. S. ALBERICI CONSTRUCTION COMPANY, INC., Respondent.

### No. 78–1063.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1978.

Decided Jan. 24, 1979.

---

Vivian A. Miller, Atty., N.L.R.B., Washington, D. C., argued for petitioner. John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Allison W. Brown, Jr., Deputy Asst. Gen. Counsel, Washington, D. C., on brief.

David G. Millar (argued) of Millar, Schaefer & Ebling, and Gregory F. Hoffmann, St. Louis, Mo., on brief, for respondent.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

The National Labor Relations Board (Board) petitions for enforcement of its order directing J. S. Alberici Construction Company, Inc. (Alberici) to preferentially hire Newell D. McQuerry and to compensate McQuerry for lost earnings caused by Alberici's discriminatory refusal to hire him in violation of sections 8(a)(3) and 8(a)(1) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(3) and 158(a)(1) (1976). Alberici resists enforcement, contending that (1) the Board's findings are not supported by substantial evidence and (2) the Board abused its discretion in enlarging the administrative law judge's original backpay order. We enforce the Board's order and remand for computation of backpay in accordance with our interpretation of that order.

## I.

### A. *Background.*

Alberici is a general construction contractor which operates in St. Louis and surrounding regions, and employs, among others, members of the ironworkers' trade. Alberici, like many employers in the construction industry, hires ironworkers only as it needs them on a job-by-job basis. Upon the completion of a project, Alberici lays off its ironworkers unless it needs those employees for another project. As a matter of convenience, Alberici normally fills job openings first by transferring ironworkers already in its employ, and it seeks ironworkers from "outside" the company only when not enough already employed and qualified ironworkers are available. Alberici employs only union members for its ironwork requirements.

Newell McQuerry is a journeyman ironworker and has been a member of the International Association of Bridge, Structural and Ornamental Iron Workers, Local 396, AFL–CIO (the Union) for some thirteen years. Like other ironworkers, McQuerry is employed job-by-job and typically works on projects of varying duration for several different employers each year. McQuerry has worked for Alberici on numerous occasions since 1965, performing at various times the full range of tasks in the ironworkers' trade. Several witnesses testified that McQuerry has earned a reputation as a vigorous enforcer of the Union's contractual rights.

On July 5, 1974, Alberici discharged McQuerry before the completion of a job, allegedly for insubordination. McQuerry filed a grievance which went to arbitration. In a decision issued on May 10, 1975, the arbitrator found McQuerry's discharge was "not for proper cause" and ordered his reinstatement with backpay.

Alberici rehired McQuerry in September 1975 to work on a microwave tower in Sullivan, Missouri. Robert Higgins, the foreman on the job in Sullivan, testified without contradiction that, as that job neared completion, Project Engineer Jacobsmeyer, an Alberici supervisor, told Higgins to lay off three people and to make certain that one was McQuerry. Jacobsmeyer explained to Higgins that "he" or "they" did not want McQuerry working for Alberici.

In September–October 1975, Alberici again employed McQuerry on a microwave tower project in Rolla, Missouri. Bill Woolsey, an old friend of McQuerry, served as general foreman on the Rolla project and hired McQuerry for that job. The Alberici job in Rolla lasted only two weeks, and from October 1975 to March 1976, McQuerry worked for a succession of other contractors.

### B. The Alleged Unfair Labor Practices.

On March 22, 1976, McQuerry telephoned Walter ("Red") Weaver, Alberici's superintendent in charge of hiring ironworkers, to ask about a job.[1] Weaver told McQuerry that Alberici had no openings at the moment but to check back because several projects, including a major job at the Chrysler plant, were scheduled. McQuerry then obtained a job with another employer in New Madrid, Missouri, which lasted from March 28 to July 22, 1976.

While in New Madrid, McQuerry telephoned Weaver three times, on June 27, June 30, and July 8, 1976, in an effort to obtain work with Alberici in the St. Louis area. On all three of those occasions, Weaver replied that no work-vacancies existed. During the first of those calls, McQuerry gave Weaver telephone numbers where he could be reached and requested that Weaver call him if a job opening materialized. Weaver testified he told McQuerry "[i]f something come [sic] up I would give him a call."

During the July 8 call, McQuerry and Weaver discussed Alberici's probable need for additional ironworkers for the upcoming job at the Chrysler plant. McQuerry asked whether Weaver would ever hire him, because he had heard rumors that Alberici had hired other ironworkers since his earlier calls to Weaver.[2] According to McQuerry, Weaver replied that he would give him a job but would "catch a lot of fire from the front office" for doing so. Weaver never notified McQuerry of any job openings, yet Alberici hired several "outside" ironworkers for the Chrysler job discussed during McQuerry's telephone calls to Weaver. That project lasted from mid-July to mid-August 1976.

On July 14, 1976, Weaver spoke with three ironworkers employed by Alberici on a job at a Chevrolet plant, asking them if they knew any ironworkers who needed a job. One of the ironworkers, Anthony Frankenreiter, volunteered that McQuerry was working outside St. Louis and wanted to return to the city. Frankenreiter recommended McQuerry as a good worker and asked whether Weaver would contact McQuerry or whether he preferred McQuerry to call him. Weaver indicated he did not want to hire McQuerry.

1. Alberici had employed Weaver since January 1, 1975, as its general field superintendent with company-wide responsibility for employment of ironworkers. Weaver testified that when he is contacted by an Alberici job foreman or project manager who needs ironworkers,

> it is my job to either call people, ironworkers that I know or have knowledge of or call the Ironworkers Local and request that they send

a certain amount of men to any particular job.

Ironworkers seeking employment with Alberici often contacted Weaver, usually by telephone.

2. The NLRB General Counsel made no claim that Alberici had ironworker jobs available on the specific days when McQuerry called Weaver.

Frankenreiter testified that Weaver stated, "I know [McQuerry] is a good hand but I don't think the front office would approve [hiring him]." Weaver also said that McQuerry "causes trouble on the job with his union beliefs." [3] Frankenreiter understood Weaver's latter remark to refer to McQuerry's vigorous enforcement of the Union's contract rights. Within three days after Weaver visited the Chevrolet plant jobsite on July 14, 1976, Alberici hired at least five "outside" ironworkers for the Chevrolet job.

About August 20, 1976, Weaver asked Mike Brown, an ironworker on Alberici's crew working at a Ralston-Purina facility, whether he knew any "sheeters" [4] who were not working. Brown replied that he had spoken the night before with McQuerry and understood that he was looking for a job. Weaver told Brown that he knew McQuerry and had nothing against him personally, but that "other people in the company didn't care for him so that was it."

Between McQuerry's call to Weaver on July 8, 1976 and the date the administrative law judge heard this case on February 16, 1977, Alberici hired some twelve to fourteen ironworkers from outside the company. Despite his promise to do so, Weaver never notified McQuerry of any job openings. Alberici did not employ or offer to employ McQuerry from the conclusion of the Rolla job in October 1975 until its offer to employ him, as required by the Board's order in this case, on October 26, 1977.

### C. *Administrative Proceedings.*

McQuerry filed unfair labor practice charges against Alberici, and the Board's regional director filed a complaint on January 27, 1977, alleging that Alberici (1) violated section 8(a)(1) of the Act by telling employees that it would not hire McQuerry because of his union beliefs, and (2) violated sections 8(a)(3) and 8(a)(1) of the Act by discriminatorily refusing to employ McQuerry.

Following the hearing held on February 16, 1977, the administrative law judge entered his findings of fact and decision concluding that Alberici violated sections 8(a)(1) and 8(a)(3) as charged. The administrative law judge issued an order requiring Alberici to preferentially hire McQuerry for the first available ironworker position for which McQuerry is qualified and to make McQuerry whole

for any loss of earnings he may have suffered by reason of the discrimination against him by payment to him of a sum of money equal to that which he would have earned, *had he been employed on the Chrysler job,* less net earnings, if any, during such period * * *. [Emphasis added.]

Upon Alberici's excepting to the administrative law judge's decision, the Board affirmed the findings and conclusions of the administrative law judge and adopted his order with the following modification. In place of the above-quoted backpay order, the Board ordered Alberici to

[m]ake Newell D. McQuerry whole for any loss of earnings he may have suffered by reason of the discrimination against him by payment of a sum equal to that which he would normally have earned *from the date of the discrimination to the date of Respondent's offer of employment* [less net earnings] * * *. [Emphasis added.]

## II.

### A. *Substantiality of the Evidence.*

It is undisputed that on the occasions McQuerry called Weaver for work no job

**3.** Weaver testified that he told Frankenreiter he did not want to hire McQuerry, but he was uncertain whether he gave a reason. Weaver did not deny saying that the Alberici "front office" would not approve hiring McQuerry, but he denied referring to McQuerry's union beliefs. Administrative Law Judge John F. Corbley specifically found that Frankenreiter's testimony on this matter was credible, and he did not credit Weaver's denial.

**4.** Sheetmetal work is an ironworker specialty. Although Weaver knew McQuerry primarily as a structural steel worker and welder, the record contains evidence that McQuerry was experienced at several other types of ironwork, including sheetmetal work.

openings existed. Alberici contends that, in light of McQuerry's failure to apply for work after July 8, 1976, when openings existed for ironworkers, the Board's finding of a discriminatory refusal to hire lacks evidentiary support.

The record does not sustain that contention. The evidence indicates that Weaver promised to call McQuerry if a position opened up on the Chrysler job and that Alberici soon thereafter filled job openings at the Chrysler plant and elsewhere without calling McQuerry, who qualified to perform the needed work. The Board concluded that Weaver's failure to call McQuerry back when ironworker positions opened constituted a refusal by Alberici to hire McQuerry.[5]

██ Upon review of the record, we conclude that the Board's determination that Alberici refused to hire McQuerry because of his activist stance as a union member, in violation of sections 8(a)(3) and 8(a)(1) of the Act, is supported by substantial evidence. The record also contains ample evidence to support the Board's determination that Alberici independently violated section 8(a)(1). Weaver's statement to Frankenreiter that Alberici would not hire McQuerry because of his union beliefs served as notice that Alberici would take reprisal against an employee for vigorous assertion of union rights, thereby coercing Frankenreiter in the exercise of rights guaranteed by section 7 of the Act, 29 U.S.C. § 157 (1976).

## B. *The Modified Backpay Order.*

██ The Board possesses broad discretion to fashion appropriate remedies once an unfair labor practice is established, and our authority to review the remedial provisions of the Board's order is a limited one. *See NLRB v. Rutter-Rex Manufacturing Co.,* 396 U.S. 258, 262–63, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); *Packing House and Industrial Services v. NLRB,* 590 F.2d 688 at 697 (8th Cir. 1978). Regarding a backpay order, the Supreme Court has said:

> When the Board, 'in the exercise of its informed discretion,' makes an order of restoration by way of back pay, the order 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' [*NLRB v. Rutter-Rex Mfg. Co., supra,* 396 U.S. at 263, 90 S.Ct. at 420.]

██ As explained more fully below, we do not think that the Board's order in this case is an attempt to achieve ends not sanctioned by the Act. Such an order requiring reinstatement and backpay is aimed at "restoring the economic status quo that would have obtained but for the company's wrong[doing]." *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 188, 94 S.Ct. 414, 427, 38 L.Ed.2d 388 (1973). Although broadly worded, the Board's remedial order, when read in the context of this case, accomplishes no more than to make McQuerry whole for the actual loss Alberici inflicted upon him when it discriminatorily refused to hire him.

██ However, we agree with Alberici that the Board's order here is susceptible of misinterpretation, and we think it appropriate to clarify the manner in which that order must be construed in the context of this case.[6]

---

5. Alberici argues that Weaver normally filled positions with ironworkers who called him while openings were available and that the Board erred in holding that Weaver's failure to call McQuerry back constituted a refusal to hire. However, Weaver himself testified that part of his job was to call ironworkers who he knew were available for work, *see* note 1 *supra,* and the record contains evidence that Weaver had called McQuerry, among others, on previous occasions when Alberici needed ironworkers. Moreover, Weaver testified he had known McQuerry for twenty years, and he admitted promising to call McQuerry back if a position opened. The evidence clearly supports the Board's conclusion on this issue.

6. The Board urges that the issue of Alberici's duties under the remedial order is premature here, because Alberici can raise its contentions in a post-decree compliance proceeding. Of course, the Board does not consider the precise

■ As already noted, the Board modified the administrative law judge's backpay order by substituting, as the starting point for computation of backpay, the amount McQuerry would have earned "from the date of the discrimination against him until the date of Respondent's offer of employment". rather than the amount he would have earned "had he been employed on the Chrysler job," as decided by the administrative law judge.

Alberici contends this modification indicates that the Board considered the company's discriminatory refusal to hire McQuerry to have continued beyond the duration of the Chrysler job. According to Alberici, the administrative law judge found that the company refused to hire McQuerry only for the Chrysler job, and any finding by the Board that Alberici refused to hire McQuerry for other jobs lacks evidentiary support. Noting that it hires ironworkers solely on a job-by-job basis, Alberici argues the Board abused its discretion in extending the original backpay order beyond the duration of the Chrysler job.

That argument by Alberici misconstrues both the findings of the administrative law judge and the Board's modified order. The administrative law judge specifically found that Alberici refused to hire McQuerry for the Chrysler job which was discussed during McQuerry's final phone call to Weaver. However, the administrative law judge also found that Alberici hired at least five new ironworkers for the Chevrolet job within two days after Weaver's conversation with Frankenreiter concerning McQuerry on July 14, 1976 and that "Weaver refused to call McQuerry for either the Chevrolet job or the Chrysler project." Those two projects covered about the same period of time, and Alberici could have hired McQuerry only for one of them, but the record does not show on what date McQuerry might have been hired for either job. The Board's modification of the administrative law judge's order to run from "the date of the discrimination" reflects the uncertainty in the evidence regarding which job Alberici would have hired McQuerry for in the absence of unlawful discrimination. That uncertainty does not detract from the Board's finding that the discrimination occurred, and the Board properly left the determination of the precise date from which backpay should run to a compliance proceeding.

■ Similarly, the Board's modification of the original backpay order to run until "the date of [Alberici's] offer of employment" reflects the uncertainty in the record regarding the length of time Alberici would have continued to employ McQuerry had it hired him for either the Chrysler project or the Chevrolet job. Although Alberici employs ironworkers on a job-by-job basis, the record indicates that Alberici normally filled its ironworker requirements on a new project by, where practicable, transferring ironworkers whom it initially hired for other jobs, instead of seeking new employees. Thus, if Alberici had hired McQuerry for one of its projects in July 1976, it might have transferred him to another job when that project was completed. The record justifies no implication of McQuerry's entitlement to preferential treatment. However, McQuerry possessed the right to be considered, equally with other ironworkers of comparable skills in Alberici's employ, for other jobs at the conclusion of the Chrysler and Chevrolet projects. Of course, whether Alberici, if it had treated McQuerry as any other ironworker with his qualifications, would in fact have employed McQuerry for other jobs after the Chrysler and Chevrolet projects ended is a matter for proof by the parties in the backpay proceedings.[7]

amount of backpay due in a case until the court enforces its general remedial order. *See Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1144 (7th Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974). Here, however, we do not address the amount of backpay to be awarded, but rather we merely interpret the Board's order. In granting the Board's petition to enforce its order, it is incumbent upon us to make clear the nature of the order we enforce.

7. In the usual case of a continuing employment contract, the employer bears the burden of proving that it would not have work available for a discriminatee due to factors unrelated to the discriminatory refusal to hire. *Cf. NLRB v.*

The Board's modified order provides for payment by Alberici to McQuerry of the sum which McQuerry "would normally have earned" from the date of Alberici's unlawful refusal to hire in July 1976 to the date of its offer of employment on October 26, 1977. As we read it, the quoted language contemplates inquiry at a further proceeding before the Board as to the length of time Alberici, absent discrimination, would have employed McQuerry during the stated period.[8] Instead of establishing the base period for computation of backpay, the Board merely set forth the parameters for determining the appropriate period.

The Board's remedial order, so interpreted, carries out the policy of the Act to make whole the victim of discrimination for loss he suffered because of the employer's discriminatory act.

Accordingly, we enforce the Board's order as we interpret it and remand the case to the Board for computation of backpay.

*Midwest Hanger Co.*, 550 F.2d 1101, 1105 (8th Cir.), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 90 (1977) (discriminatory discharge). Here, Alberici contends that it has met that burden by showing that it employs ironworkers solely on a job-by-job basis. However, the record also discloses an Alberici policy to reemploy ironworkers already working for the Company, although the strength of that policy as applied during the relevant time period does not appear. The Board should consider these special circumstances in determining the probable length of McQuerry's continued employment in the absence of discrimination.

8. If the Board's order were interpreted to foreclose such inquiry as to how long Alberici would have employed McQuerry, it would require payment of backpay in excess of McQuerry's probable earnings, even if Alberici had treated him with scrupulous fairness. Such an order would not be remedial but punitive. *See NLRB v. Local No. 2 of United Association of Journeymen and Apprentices of Plumbing and Pipefitting Industry*, 360 F.2d 428, 434 (2d Cir. 1966). It is settled that "the Board's remedies must be remedial, not punitive, and they must be functions of the purposes to be accomplished." *Packing House and Industrial Services v. NLRB*, 590 F.2d 688 at 697 (8th Cir. 1978). *See Local 60, United Brotherhood of Carpenters v. NLRB*, 365 U.S. 651, 655, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961). This court possesses the power to modify a backpay order that goes beyond the remedial purposes of the Act. *See NLRB v. Columbia Tribune Publishing Co.*, 495 F.2d 1384 (8th Cir. 1974).