720 F.Supp. 862 (1989)
Stephen T. AGUINAGA, Wayne Pappan, and Janet Brown, Individually and on behalf of all other union members similarly situated, Plaintiffs,
v.
UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO/CLC, Defendant.
Civ. A. No. 83-1858-T.
United States District Court, D. Kansas.
July 12, 1989.
*863 *864 *865 Ken M. Peterson, Morris, Laing, Brock, Evans & Kennedy, Robert C. Brown, Smith, Shay, Farmer & Wetta, Wichita, Kan., for plaintiffs.
Harry Huge, Stephen L. Hoffman and Gary L. Harris, Rogovin, Huge & Schiller, Washington, D.C., Paul L. Hulsey, Motley, Loadholt, Richardson & Poole, Charleston, S.C., for defendant.

OPINION AND ORDER
THEIS, District Judge.

I. INTRODUCTION
Following an eight week trial on the issue of liability in this hybrid breach of contract/breach of duty of fair representation case brought pursuant to section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, the jury returned a verdict in favor of the plaintiff class. Specifically, the jury found that the plaintiffs' former employer, defendant John Morrell and Company (Morrell), which has settled with the plaintiffs and was not involved in the trial, breached two provisions of the collective bargaining agreement in effect during the relevant time periods (the 1979 Master Agreement). The jury further found that defendant United Food and Commercial Workers International Union (UFCW or Union) breached the duty of fair representation which it owed to the plaintiffs in dealing with Morrell's breaches of the 1979 Master Agreement. The court directed a verdict in favor of defendant Local Union 340 at the close of all the evidence.
The court previously bifurcated the case into liability and damages phases. The damage phase is to be tried to the court. The parties have submitted briefs on the legal issues surrounding the damages phase. The court is now prepared to make certain preliminary rulings on damage issues which will govern the remainder of the case and determine the course of the damage trial.
The court notes that the same analysis applies to duty of fair representation suits brought in federal court pursuant to section 301 and unfair labor practice proceedings before the National Labor Relations Board. See San Francisco Web Pressmen and Platemakers' Union No. 4 v. NLRB, 794 F.2d 420, 424 n. 7 (9th Cir.1986). The court will therefore rely on NLRB cases in addition to section 301 cases.
In both its damages brief (Dk. No. 583) and its supplemental damages brief (Dk. No. 605), the Union makes several arguments that it cannot be held liable for *866 any backpay to the plaintiff class. Some of the arguments are new; others have already been rejected by the court. The court finds the Union's position that it cannot, as a matter of law, be liable for backpay damages to be wholly without merit. The court therefore turns to the legal issues governing the assessment of liability and the measure of damages in the present case.
The jury found that Morrell breached the following two provisions of the 1979 Master Agreement:
10. The Management of the plant and direction of the working force, including the right to hire, suspend or discharge for just cause, to assign to jobs, to transfer Employees within the plant, to increase and decrease the working force, to determine products to be handled, produced or manufactured, to establish schedules of production and the methods, processes and means of products or handling, is vested exclusively in the Company, provided this will not be used for the purpose of discrimination against any Employee or to avoid any of the provisions of this Agreement, or any local agreement.
....
100....
(b) Within 5 years after the Company closes down or substantially terminates production operations at any plant or division or department of [a] plant covered by this Agreement, the Company will not enter into a contract or other similar arrangement whereby the Company agrees to purchase from a third party producer's plant located within 100 miles of the closed plant, division or department, the production output of such third party producer's plant or a volume of such output substantially equivalent to or exceeding the output of the closed Company plant, division or department, of the same product or substantially the same product which the Company produced at its closed plant of division or department thereof.
Plaintiffs' Exh. 1.
The evidence at trial established and the jury found that Morrell had a surreptitious plan to close its Rodeo Meats plant in Arkansas City, Kansas, where the plaintiffs were employed, and to reopen it later as a nonunion plant in violation of section 10 of the 1979 Master Agreement. The plant was closed in June 1982, purportedly permanently, and the plaintiffs were paid severance benefits. The plant was reopened in March 1983 as Ark City Packing Company (ACPC). ACPC employed significantly fewer employees at a lower wage rate than Rodeo Meats employed under the 1979 Master Agreement.
The jury's finding of a breach of section 100(b) was supported by evidence that, after Rodeo closed, Morrell obtained substitute product from outside the 100 mile limit and shipped this product into Wichita, which is within a 100 mile radius of Arkansas City. This substitute product was stored, inventoried, and distributed from a cold storage facility Morrell rented in Wichita.
The jury further found that the Union breached its duty of fair representation by acting arbitrarily, discriminatorily, or in bad faith in acting or failing to act to remedy Morrell's breaches of the Master Agreement. Specific facts and evidence will be discussed when necessary.

II. ASSESSMENT OF LIABILITY

A. Apportionment vs. Joint and Several Liability
Plaintiffs argue in their damages brief (Dk. No. 572) and reply brief (Dk. No. 584) that the Union should be held jointly and severally liable with Morrell for all damages suffered by the plaintiff class. Since Morrell has settled with the plaintiff class, the Union would be solely responsible for the payment of all damages awarded less the amount of Morrell's settlement. The Union argues that if liability is to be imposed, it must be apportioned between it and Morrell. The court agrees with the Union in this regard.
In discussing the imposition of damages against an employer and a union in a breach of contract/breach of duty of fair *867 representation case, the Supreme Court has stated:
The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer.
Vaca v. Sipes, 386 U.S. 171, 197-98, 87 S.Ct. 903, 920-21, 17 L.Ed.2d 842 (1967). In Vaca, the Court noted in dicta that it was
not dealing here with situations where a union has affirmatively caused the employer to commit the alleged breach of contract. In cases of that sort where the union's conduct is found to be an unfair labor practice, the NLRB has found an unfair labor practice by the employer, too, and has held the union and the employer jointly and severally liable for any back pay found owing to the particular employee who was the subject of their joint discrimination. Even if this approach would be appropriate for analogous § 301 and breach-of-duty suits, it is not applicable here.
Id. at 197 n. 18, 87 S.Ct. at 920 n. 18 (citations omitted).
The Supreme Court recently reaffirmed Vaca's "governing principle" of allocation of responsibility in Bowen v. United States Postal Service, 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983). Of "paramount importance" is the right of the employee, who has been injured by both the employer's breach of contract and the union's breach of the duty of fair representation, to be made whole. Id. at 222, 103 S.Ct. at 594. While both the employer and the union have caused damages to the employee, the union will be responsible for the increase in damages caused by its breach of duty. Id. at 223, 103 S.Ct. at 595. While reaffirming the general rule that damages are to be apportioned between the employer and the union, the Court again noted in dicta that "this is not a situation in which either the union or the employer has participated in the other's breach." Id. at 223 n. 11, 103 S.Ct. at 595 n. 11 (citing Vaca, 386 U.S. at 197 n. 18, 87 S.Ct. at 920 n. 18). Under the general rule of Vaca and Bowen, liability must be apportioned; joint and several liability is the exception.
Plaintiffs cite several cases in support of their position that joint and several liability is appropriate in the present case. In two cases cited by the plaintiffs, the district courts did not impose joint and several liability. Ryman v. Office and Professional Employees Int'l Union, 628 F.Supp. 421, 427 n. 7 (E.D.Tex.1985) ("Because defendant Texaco played no part in the union's alleged breach of its duty of fair representation, it could not be held liable for that breach."); Hardesty v. Essex Group, Inc., 550 F.Supp. 752, 768 (N.D.Ind. 1982) (no damages could be awarded against the union defendants because they did not participate in the employer's alleged wrongful discharge of plaintiff). Hardesty is unpersuasive for the additional reason that the court held (prior to the Supreme Court's decision in Bowen) that back pay could be assessed only against the employer and not against the union. Id. at 767.
In Waters v. Wisconsin Steel Works, 427 F.2d 476 (7th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 911 (1970), while the court stated that the union could be joined as a defendant if it was the "moving force in producing a violation of the contract by the employer," 427 F.2d at 491 n. 26, the court further held that the union would be liable only for the damages flowing from its own conduct. Id. at 491.
Plaintiffs cite two duty of fair representation cases in which joint and several liability was imposed. In Baskin v. Hawley, 807 F.2d 1120 (2d Cir.1986), the union neither requested an apportionment instruction nor objected to its absence at trial. On appeal the Second Circuit found no plain error and affirmed the imposition of joint and several liability. Id. at 1132. Further, joint and several liability was appropriate because the union had participated in the underlying wrongs. Id. at 1133. Plaintiffs *868 also rely on Jones v. Trans World Airlines, Inc., 495 F.2d 790 (2d Cir.1974). In Jones, the employer was held jointly and severally liable with the unions because it agreed with the union to demote and lay off nonunion employees. Id. at 798-99.
Joint and several liability may be imposed in a limited number of situations in light of the Supreme Court's footnotes in Vaca and Bowen. The Supreme Court has indicated that joint and several liability may be appropriate when either the union or the employer has caused or participated in the other's breach. Bowen, 459 U.S. at 223 n. 11, 103 S.Ct. at 595 n. 11; Vaca, 386 U.S. at 197 n. 18, 87 S.Ct. at 920 n. 18. The court thus must review the evidence presented in the liability trial of this case.
In the present case, plaintiffs presented no evidence that the Union caused or participated in Morrell's breaches of the 1979 Master Agreement. Prior to closing the Rodeo Meats plant, Morrell had formulated a secret plan to close the plant, purportedly permanently, and reopen it nonunion at a later time. See Plaintiffs' Exh. 400-403. After Morrell put its plan into effect, the Union made some attempts to resolve the situation. The Union later determined, however, to abandon the former Rodeo Meats employees. No evidence was presented indicating that the Union played a role in or had knowledge of Morrell's plan until the events were unfolding in the summer of 1982.
Morrell was the initiator of the scheme. No later than December 19, 1981, Morrell had formulated its plan to close and reopen several of its plants. On that date, Morrell sent the Union a six month notice of its intent to close the Rodeo Meats plant, pursuant to section 98(a) of the 1979 Master Agreement. Plaintiffs' Exh. 23. Morrell's breach was continuing in nature, since it concealed its plans from the Union. No evidence was presented to implicate the Union in the closing plan as of late 1981.
The Union knew or should have known during the summer of 1982, and no later than September 9-10, 1982, what Morrell was planning. In the summer of 1982, Morrell and the Union engaged in negotiations on a new Master Agreement. A new agreement, the 1982 Master Agreement (plaintiffs' Exh. 360) was eventually concluded. The 1982 Master Agreement covered Morrell's remaining facilities at Estherville, Iowa, Sioux Falls, South Dakota, and East St. Louis, Illinois.
On September 9 and 10, 1982, the Union entered into two side letter agreements with Morrell. The September 9 letter agreement affected the interpretation of section 101 of the Master Agreement. That section provides in pertinent part:
New meat packing or processing plants or abattoirs which may be established by the Company shall come under the Master Agreement subject to the following:
(a) The plant shall be one which is either (1) carved out of an existing packing plant presently covered by the Master Agreement or (2) established in the greater Midwest (and for this purpose, Pennsylvania west of the Alleghenies shall be included in the Midwest) or the far West (excluding Southeast, Southwest or Northeast).
....
Plaintiffs' Exh. 360. The September 9 letter agreement provides in pertinent part:
For purposes of Section 101(a)(2), the Company plants located at Fort Smith, Arkansas, El Paso, Texas and Arkansas City, Kansas shall be included in the Southwest and Memphis, Tennessee shall be included in the Southeast.
In addition, the Southwest shall include the states of Arizona, New Mexico, Texas, Oklahoma and Arkansas. Southeast shall include Louisiana, Mississippi, Alabama, Georgia, Tennessee, Florida, North Carolina and South Carolina.
Plaintiffs' Exh. 165. The September 10 letter agreement provided:
The parties agree that nothing in the Master Agreement executed today precludes the Company from reopening previously closed plants located at El Paso, Texas, Fort Smith, Arkansas, Arkansas City, Kansas and Memphis, Tennessee and that if such plants are reopened, no provision of said Master Agreement requires *869 that such plants be subject to said Master Agreement.
Plaintiffs' Exh. 166. These two letter agreements specifically excluded the Arkansas City plant from the coverage of the Master Agreement, thereby allowing Morrell to reopen the plant without having to recognize the Union or pay Master Agreement wages. The language of the two letter agreements along with other direct and circumstantial evidence upon which the jury must have relied should have made the Union aware that Morrell had planned all along to reopen its closed plants.
The evidence presented at trial indicated that after the Union knew or should have known what Morrell was planning, it failed to take the appropriate steps to remedy Morrell's breach. The Union's conduct is similar to that of a union who fails to process a meritorious grievance in the typical duty of fair representation case. The Union's conduct in the present case was not of the egregious nature required for the imposition of joint and several liability. Joint and several liability shall not be imposed in the present case. To hold otherwise would result in the imposition of joint and several liability in virtually all hybrid breach of contract/breach of duty of fair representation cases. Such a result is not contemplated by Bowen and Vaca.

B. The Apportionment Formula
Plaintiffs have only briefly addressed apportionment of damages in their reply brief. The court has determined that two methods of apportioning damages exist.
The court may apportion damages on a percentage basis, similar to comparative fault. This method has some appeal in that the court would be able to apportion damages according to the relative fault of Morrell and the Union. Under a percentage apportionment theory, the court could assess less than 50% of the fault against the Union. This would be consistent with the evidence at trial which indicated that Morrell was the initial and primary wrongdoer. The court has not, however, found any cases which apply this apportionment rule or discuss how it shall be determined on a mathematical basis. The court's judgment must be based on a consideration of all the evidence.
The second method of apportionment is based upon the hypothetical date upon which the plaintiffs would have been reinstated had the Union fulfilled its duty of fair representation. This method of apportionment does have case law support in the context of unfair labor practice charges before the NLRB and hybrid suits in federal court:
An employer and a union are jointly and proportionately liable for backpay when the employer has caused damage by wrongfully discharging the employee and the union has increased that damage by breaching its duty of fair representation. The employer and union each are liable for the portion of damages that it caused: the employer for back pay from the date of the wrongful termination to the date the employee would have been reinstated had the union not breached its duty, and the union for backpay thereafter.
San Francisco Web Pressmen and Platemakers' Union No. 4 v. NLRB, 794 F.2d 420, 424 (9th Cir.1986) (citations and footnote omitted) (unfair labor practice proceeding). See also Colon Velez v. Puerto Rico Marine Management, Inc., 693 F.Supp. 1335, 1344 (D.P.R.1988) (hybrid breach of contract/breach of duty of fair representation case).
The trial court in Bowen instructed the jury that the issue of apportionment of damages was left to the jury's discretion. The trial court further instructed that the jury could base apportionment on the date of a hypothetical arbitration decision, i.e., the date upon which the employer would have reinstated the employee had the union fulfilled its duty. See Bowen, 459 U.S. at 215, 103 S.Ct. at 591. The precise method of apportionment was not before the Supreme Court in Bowen, however. Id. at 214, 103 S.Ct. at 590 ("The issue is whether a union may be held primarily liable for that part of a wrongfully discharged employee's *870 damages caused by his union's breach of its duty of fair representation.").
In a dissenting opinion, Justice White characterized the majority as holding:
that an employer who wrongfully discharges an employee protected by a collective-bargaining agreement with an arbitration clause is only responsible for backpay that accrues prior to the hypothetical date upon which an arbitrator would have issued an award had the employee's union taken the matter to arbitration. All backpay damages that accrue after this time are the sole responsibility of the union, even where, as here, the union is in no way responsible for the employer's decision to terminate the employee.
Bowen, 459 U.S. at 230-31, 103 S.Ct. at 599 (White, J., concurring in the judgment in part and dissenting in part). Contrary to the opinion of the dissenters in Bowen, this court does not believe that the Supreme Court has approved this hypothetical date theory of apportionment.
Application of this particular method of apportionment necessarily hinges on the grievance and arbitration provisions of the 1979 Master Agreement. The court has determined that backpay will be awarded based on Morrell's violation of section 10 of the 1979 Master Agreement, the section 100(b) violation being subsumed in the section 10 violation (see infra § III.A). To apportion damages according to the hypothetical arbitration date, the court would have to determine the length of time necessary to work through the various steps of the grievance process in light of when the violation occurred. A drawback to this method of apportionment is that a union may bear a majority of the backpay awarded (e.g., approximately two-thirds of the backpay in Bowen, 459 U.S. at 217 n. 6, 103 S.Ct. at 592 n. 6) even though it did not initiate the wrongful conduct and was not the primary wrongdoer. A further disadvantage is that the district court is required to engage in considerable guesswork in arriving at the dates when the various stages of the grievance procedure would have been completed had they been initiated by the union.
While a jury may apportion damages in a hybrid case in any way it sees fit, see, e.g., 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions § 96.17 (4th ed. 1987), this court must be able to explain its conclusions in some rational manner. After considering the two methods of apportionment, the court has determined to apportion damages on a percentage fault basis. The court believes that this method of apportionment is consistent with both the hypothetical time frame of an arbitration decision and the duration provision of the 1979 Master Agreement. After reviewing the evidence presented at the liability trial, the court concludes that 75% of the damages should be assessed against Morrell and 25% assessed against the Union. The court's decision to apportion damages is a final one. The court will not address joint and several liability further. At the damage trial, certain evidentiary matters may remain. However, the court does not believe that the method of apportionment is a factual issue.

III. DAMAGES
The purpose of an award of backpay (including fringe benefits) is to make employees whole for the losses suffered. Bowen v. United States Postal Service, 459 U.S. 212, 223, 103 S.Ct. 588, 595, 74 L.Ed.2d 402 (1983); NLRB v. Master Slack, 773 F.2d 77, 83 (6th Cir.1985). In unfair labor practice proceedings, the NLRB's task is to find a remedy that will restore the economic status quo that would have obtained but for the unfair labor practice. Remedies that award employees more than they would have received but for the violations are punitive and thus improper. See NLRB v. Fort Vancouver Plywood Co., 604 F.2d 596, 602 (9th Cir. 1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980); see also Kallmann v. NLRB, 640 F.2d 1094, 1103 (9th Cir.1981); NLRB v. J.S. Alberici Construction Co., 591 F.2d 463, 468, 470 n. 8 (8th Cir.1979). Thus, only one recovery is allowed, even if the employer and the union *871 committed multiple breaches. The damage formula the court chooses must give a close approximation of the amounts due. Damages need not be proven with exactitude, however. NLRB v. Overseas Motors, Inc., 818 F.2d 517, 521 (6th Cir.1987). The Union complains in its damage brief that certain of plaintiffs' damage computations are speculative. It is due to Morrell's and the Union's wrongful conduct, however, that plaintiffs were damaged. The Union cannot now complain that plaintiffs' damages are incapable of being computed with exactitude.
In determining the amount of backpay due the plaintiffs, the court must determine the total amount of backpay for which Morrell and the Union would have been liable had there been no settlement. Morrell's share of the backpay must be assessed against it conceptually as if no settlement had been reached.
In the sections which follow, the court will set out its preliminary conclusions on the damage variables. The parties may wish to present evidence on these matters during the damage trial, if relevant evidence exists. The court believes that the gross amount of backpay (excluding fringe benefits) is uncontroverted at this point, since the number of plaintiffs in the class, the wage rate received before closing, and the average number of hours worked per week before the closing are beyond good faith dispute. The Union may wish to prove that, absent Morrell's scheme, Morrell still would have decreased production and demanded wage cuts. The court must point out that it was the Union's duty to prevent these matters from occurring.

A. Section 10 vs. Section 100(b)
Plaintiffs assert that because the jury found a violation of section 100(b) of the 1979 Master Agreement each plaintiff is entitled to five years' backpay and related damages. The court must reject this theory. Damages will be awarded based on the section 10 violation, which is supported by sufficient evidence and law. As the court noted several times during the course of the liability trial, the section 100(b) claim rested on a shaky legal and factual foundation.
While section 100(d) authorized an arbitrator to award damages for a violation of section 100(b), it did not authorize an automatic five year backpay award regardless of the duration of the breach. In the present case, the section 100(b) breach did not last for five years. Further, section 100(b) served as a limitation on Morrell's conduct and not as a job protection measure. Section 100(b) operated in the nature of an injunction or a covenant not to compete by prohibiting Morrell from taking certain actions. Even thought the section was seen by the plaintiffs as a job protection measure, it did not guarantee any jobs. Unlike section 10, section 100(b) had no relation to the actual operation of the Rodeo plant (hours, number of employees, type of work, etc.). Finally, section 100(b) provided no method of computing damages in any reasonable way.
Section 10 is the broader of the two contractual provisions. Since the plaintiffs may obtain only one recovery, any damages for the breach of section 100(b) are subsumed within the recovery for the breach of section 10. Consequently, damages will be awarded based solely on the breach of section 10.

B. Duration of Damage Period
In determining the length of the damage period, the court was faced with a wide range of choices but found little guidance in the case law. The court will first address the parties' claims on the appropriate duration of the damage period.
Plaintiffs first assert that damages for backpay and benefits run to the date of judgment. The sole case plaintiffs cite provides little to support their position. See De Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281 (1st Cir.) (lost earnings awarded to date of judgment when not contested by the parties), cert. denied sub. nom. Puerto Rico Tel. Co. v. De Arroyo, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970).
Plaintiffs next assert that they are entitled to backpay for a period of five years *872 based upon the violation of section 100(b) of the 1979 Master Agreement. As discussed supra § III.A, the jury's finding of a violation of section 100(b) rests on a shaky factual and legal basis. The court has determined not to award separate damages for the violation of section 100(b). Rather, those damages are subsumed in the damages to be awarded for the breach of section 10.
The Union asserts that no backpay can be awarded past the September 1, 1982 expiration date of the 1979 Master Agreement. In support of its position, the Union cites a number of cases involving breaches of collective bargaining agreements. Damages for a breach of a collective bargaining agreement accrue until the expiration of the agreement. See International Bhd. of Elec. Workers v. A-1 Elec. Serv., Inc., 535 F.2d 1 (10th Cir.), cert. denied, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976). The cases cited by the Union are not hybrid cases and do not address the appropriate term of damages in a hybrid case such as the present action. The position taken by the Union would result in the same measure of damages in a hybrid action as in a breach of contract action. No additional damages would be assessed for the Union's arbitrary, discriminatory, or bad faith treatment of plaintiffs following Morrell's breach of contract.
The court is aware of one district court which has applied the standard asserted by the Union. See Colon Velez v. Puerto Rico Marine Management, Inc., 693 F.Supp. 1335 (D.P.R.1988). In Colon Velez, the district court stated, without authority or reasoning, that the termination of backpay liability "obviously coincides with the termination of the collective bargaining agreement." Id. at 1345. The court does not find this decision to be particularly persuasive.
A union's duty of fair representation is not contractual, but is statutory. See Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). A hybrid breach of contract/breach of duty of fair representation case is not the same as a common law contract case. See Bowen v. United States Postal Service, 459 U.S. 212, 220, 103 S.Ct. 588, 593, 74 L.Ed.2d 402 (1983). The court believes, however, that damages in a hybrid case must have a contractual basis. Morrell breached the contract. It was the contract that determined the terms and conditions of employment, i.e., the status quo from which damages are to be computed. It was the contract which determined the plaintiffs' rights to continued employment.
While the court believes that the damages to be awarded must have a contractual basis, the court does not believe the damage term should be as limited as the Union proposes. Accepting the proposition that the expiration of the 1979 Master Agreement cuts off backpay liability, the court finds the September 1, 1982 cutoff date to be incorrect. The Union's contention that the 1979 Master Agreement expired on September 1, 1982 is based on Morrell's notification to the Union of its intent to terminate the agreement. See Plaintiffs' Exh. 340. Morrell's notice of intent to terminate was an integral part of its plan to pretend to close the plant and reopen nonunion. The court believes that Morrell's fraud and deceit renders the termination notice invalid. Pursuant to section 112 of the 1979 Master Agreement, the contract would not have expired on September 1, 1982. Section 112 provides:
Except as otherwise provided, all of the provisions of this Agreement shall take effect as of September 1, 1979, and shall remain in effect until September 1, 1982, and from year to year thereafter, provided, however, that this Agreement may be terminated on September 1, 1982, or on September 1 of any year thereafter by either party by written notice mailed to the Company at its general office, or to the Union at its national headquarters at least sixty (60) days prior to September 1, 1982, or prior to September 1 of any year thereafter.
Plaintiffs' Exh. 1. Pursuant to section 112, the court could award damages for backpay and benefits from the date of closing to at least September 1, 1983.
*873 The maximum term for which damages could be awarded would run from the date of closing to February 18, 1987, the date the court approved the plaintiffs' settlement with Morrell. As a part of the settlement, plaintiffs expressly gave up their right to reinstatement. Dk. No. 240. Backpay liability normally runs until the employer makes a valid, unconditional reinstatement offer. NLRB v. Louton, Inc., 822 F.2d 412, 415 (3d Cir.1987); Polynesian Cultural Center, Inc. v. NLRB, 582 F.2d 467, 475 (9th Cir.1978). A claimant who rejects a valid reinstatement offer is therefore not entitled to backpay for the period after the rejection of the offer. In the same manner, the plaintiffs' waiver of all rights to reinstatement via the settlement with Morrell operates to cut off all liability for backpay. Cf. Foust v. International Bhd. of Elec. Workers, 572 F.2d 710 (10th Cir.1978) (damages awarded from date of discharge until date plaintiff settled with his employer and waived reinstatement), rev'd in part on other grounds, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979).
The court believes a middle ground between the Union's proposal of under three months and plaintiffs' proposal of over five years to be appropriate. The court believes, preliminarily at least, that damages should be awarded from the date of the closing of the Rodeo Meats plant until September 1, 1983. The court remains mindful that Morrell had broad rights to decrease production or change the methods of production and distribution. Plaintiffs were not guaranteed lifetime jobs pursuant to the Master Agreement. The length of the damage period may be an evidentiary matter that the parties should address at trial.

C. Number of Plaintiffs
Once the breach of contract and breach of duty of fair representation are shown, the court begins with the presumption that all members of the plaintiff class are entitled to backpay. The defendant must then establish that fewer employees are entitled to damages. In the present case, the Union bears the burden of proving by a preponderance of the evidence that certain employees would have been discharged or laid off at a later date, that certain jobs would have been phased out, or that fewer jobs would have been available, even if no breach of contract and breach of duty of fair representation had occurred. See NLRB v. Master Slack, 773 F.2d 77, 83 (6th Cir.1985); NLRB v. C.R. Adams Trucking, Inc., 767 F.2d 1276, 1277 (8th Cir.1985); NLRB v. Rain-Ware, Inc., 732 F.2d 1349, 1353 (7th Cir.1984); Kallmann v. NLRB, 640 F.2d 1094, 1102 (9th Cir. 1981); NLRB v. Fort Vancouver Plywood Co., 604 F.2d 596, 602-03 (9th Cir.1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).
Pursuant to section 10 of the 1979 Master Agreement, Morrell had broad rights to decrease the work force, provided the decrease was not for the improper purpose of avoiding the requirements of the Master Agreement. The Union will be given the opportunity to prove at trial that Morrell would have scaled production back at the Rodeo Meats plant had the plant remained open. The fact that ACPC reopened with approximately 200 employees (compared to the over 600 members of the plaintiff class) may be evidence of Morrell's intent to decrease production or change the methods of production and distribution, but is not determinative. No evidence was presented during the liability trial that Morrell ever expressed an intention to reduce output at the Rodeo Meats plant.

D. Wage Rate
Since the purpose of an award of backpay is to restore the economic status quo, see supra, the award of backpay must be based, at least initially, on the wage rate contained in the 1979 Master Agreement. After September 1, 1982, the expiration date of the 1979 Master Agreement (or September 1, 1983, the expiration date following a one year extension), the appropriate wage rate could be the lower chain rate contained in the 1982 Master Agreement, in view of the evidence that the Union wanted all local unions at the various Morrell plants to stay "hitched to the chain." UFCW policy was to negotiate one Master *874 Agreement to cover all plants; individual local unions were not to negotiate with Morrell. Absent Morrell's conduct in closing the plant, it is probable that the Rodeo plant would have been governed by the new Master Agreement in effect at the remaining Morrell plants. The new "chain" rate contained in the 1982 Master Agreement takes into account the changed economic circumstances in the meat packing industry.
The court will not use the wage rates paid at ACPC to compute backpay. The initial wage rate paid upon the reopening of ACPC was not achieved through collective bargaining and does not accurately reflect the economic conditions in the industry. Rather, the initial ACPC rate was unilaterally imposed by Morrell. The court also rejects the Union's argument that the wage rate obtained when the Union reached a contract at ACPC should govern. The new contract was not a part of the Master Agreement and, as such, deviated from the Union's policy of staying hitched to the chain.

E. Hours Per Week
The case law reflects two methods of determining the number of hours per week for which a discriminatee is entitled to compensation. First, the court may award backpay based on the hours each individual worked in the years before the violation. NLRB v. Laborers' Int'l Union, 748 F.2d 1001, 1004 (5th Cir.1984), cert. denied, 470 U.S. 1085, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). Second, the court may award back pay based on the representative employees method. This method requires averaging the earnings during the backpay period of other employees who were earning the same as the discharged employee at the time of the discharge. NLRB v. S.E. Nichols of Ohio, Inc., 704 F.2d 921, 924 (6th Cir.), cert. denied, 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983). A variation of this method requires a comparison between the discriminatee and one representative employee. NLRB v. Overseas Motors, Inc., 818 F.2d 517, 520 (6th Cir.1987).
The court cannot use the representative employees method because there are no representative employees to serve as a comparison. Morrell closed the Rodeo plant and discharged the entire work force. The court therefore cannot look to other employees to determine what hours the plaintiffs would have worked had the Rodeo plant stayed open. The court will therefore begin by awarding backpay based on the prior hours worked by each plaintiff. Plaintiffs have proposed using the average hours worked per week by each plaintiff in the eighteen months prior to the plant closing. The court finds this to be a reasonable approximation of the hours the plaintiffs would have worked, at least initially, had the Rodeo plant remained open.
Since the Union has the burden of proving, and must be given the opportunity to prove, that less work would have been available, see supra, the Union will be given the opportunity to prove that the plaintiffs' hours would have been cut back had the Rodeo plant remained open. The experience at ACPC may be relevant but is not determinative, since the Union and the company were "sleeping" together at that time.

F. Benefits

1. Health Benefits
Medical insurance or other health benefits are recoverable as a part of the damage award. The specifics of Morrell's health benefits plan are not before the court at this time. See Plaintiffs' Exh. 1, § 104 & App. F (stating that the health insurance plan is contained in a separate booklet). Plaintiffs refer to Plaintiffs' Exh. 2, which has not been admitted into evidence.
Plaintiffs have requested damages for the loss of health benefits in an amount based on the average monthly cost incurred by Morrell per worker during the one year period prior to closing. Alternatively, plaintiffs seek damages based on the average monthly cost per worker at Morrell's Sioux Falls, South Dakota plant during the years 1982-86. The Union asserts that *875 plaintiffs may be compensated only for their out of pocket losses.
Plaintiffs may be compensated for the loss of their medical benefits if plaintiffs have purchased substitute insurance coverage or have incurred out of pocket, uninsured medical expenses which would have been reimbursed under the employer's plan. See Galindo v. Stoody, 793 F.2d 1502, 1517 (9th Cir.1986) (citing Foust v. International Bhd. of Elec. Workers, 572 F.2d 710, 718 & n. 1a (10th Cir.1978), rev'd in part on other grounds, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979)). To recover for the loss of health benefits, plaintiffs might need to establish the actual medical expenses or costs of substitute insurance coverage for each plaintiff during the damage period. Further evidence and briefing should clarify this point.

2. Other Benefits
The Union does not dispute that plaintiffs' pension losses are recoverable. The pension agreement is not before the court. See Plaintiffs' Exh. 1, § 102 & App. G (stating that the pension agreement is contained in a separate booklet). Plaintiffs refer to Plaintiffs' Exh. 2, which has not been admitted into evidence. The court can make no specific ruling at this time.
Any other fringe benefits existing at the time of Morrell's breach shall also be recoverable. Galindo, 793 F.2d at 1517-18.

G. Prejudgment Interest
Both parties concede that prejudgment interest on a backpay award is discretionary. The court has considered the arguments contained in the briefs and has determined that prejudgment interest shall be allowed.

H. Attorneys' Fees
Both parties acknowledge that attorneys' fees may be a potential item of damages in hybrid breach of contract/breach of duty actions. Plaintiffs concede that an award of attorneys' fees is premature. Specifics should be dealt with in an application for attorneys' fees following entry of judgment on damages. The Union disputes that any attorneys' fees are recoverable from it in this action. The court will reserve final ruling until the matter is ripe for consideration, but advises the Union that it should be prepared to pay such fees and consider such item in any settlement discussions.

IV. SETOFFS

A. In General
The burden is on the plaintiffs to prove the gross amounts of backpay and related damages due each of them. The burden then shifts to the defendant to demonstrate any reductions in the amount of backpay or any facts which would mitigate its liability. Lundy Packing Co. v. NLRB, 856 F.2d 627, 629 (4th Cir.1988); Kawasaki Motors Mfg. Corp., U.S.A. v. NLRB, 850 F.2d 524, 527 (9th Cir.1988); NLRB v. Overseas Motors, Inc., 818 F.2d 517, 521 (6th Cir.1987); NLRB v. Laredo Packing Co., 730 F.2d 405, 407 (5th Cir.1984) (per curiam).

B. Interim Earnings
Plaintiffs concede that the interim earnings of the plaintiff class are proper setoffs. Dk. No. 572 at 29 n. 5 (citing Alfred M. Lewis, Inc. v. NLRB, 681 F.2d 1154 (9th Cir.1982); NLRB v. Pilot Freight Carriers, Inc., 604 F.2d 375 (5th Cir.1979)).

C. Severance Benefits
Plaintiffs also concede that severance payments made by Morrell are proper setoffs against the damage award. Dk. No. 572 at 29 n. 5 (citing Fariss v. Lynchburg Foundry, 769 F.2d 958 (4th Cir.1985); EEOC v. Sandia Corp., 639 F.2d 600 (10th Cir.1980)).

D. Union Dues
The Union asserts, without citing any authority, that union dues which normally would have been deducted from the plaintiffs' paychecks pursuant to the 1979 Master Agreement should be deducted from the backpay award. Unless the Union provides the court with some authority for this position, the court will not allow *876 union dues to be a setoff. The jury found a breach of the Union's duty for which dues are paid. The Union should not be rewarded by a setoff of dues from the damages caused by its own wrongful conduct.

E. Unemployment Compensation
The decision whether to offset unemployment compensation is within the trial court's discretion. Cooper v. Asplundh Tree Expert Co., 836 F.2d 1544, 1555 (10th Cir.1988); EEOC v. Sandia Corp., 639 F.2d 600, 624-26 (10th Cir.1980). Unemployment compensation is a collateral source which is traditionally not deducted from a backpay award, primarily because it is unfair to give the defendant the benefit of it. Cooper, 836 F.2d at 1555; Sandia Corp., 639 F.2d at 625.
Unemployment compensation benefits are awarded by the state in furtherance of a separate social policy. Sandia Corp., 639 F.2d at 624; see K.S.A. 44-702 (policy of state). This reasoning applies even though the payments made by the state are funded by taxes paid by employers. See NLRB v. Gullett Gin Co., 340 U.S. 361, 364, 71 S.Ct. 337, 339, 95 L.Ed. 337 (1951). In the exercise of its discretion, the court finds that the Union should not benefit from the unemployment compensation received by members of the plaintiff class, especially since that compensation was funded by Morrell. Unemployment compensation shall not be an offset.

F. Disability Benefits (Workers Compensation)
Plaintiffs rely on Whatley v. Skaggs Cos., 707 F.2d 1129, 1138-39 (10th Cir.), cert. denied, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983), a Title VII suit, for the proposition that disability benefits are not a proper offset against a backpay award. The NLRB, however, has long held that disability benefits may be an offset in certain situations. See American Mfg. Co., 167 N.L.R.B. 520 (1967).
The American Manufacturing decision has been cited in support of two separate propositions. First, an employer is not liable for backpay for periods during which an employee is unavailable for work due to a disability. In other words, backpay is tolled during the period of disability. See NLRB v. Louton, Inc., 822 F.2d 412, 415 (3d Cir.1987) (citing Canova v. NLRB, 708 F.2d 1498 (9th Cir.1983); American Mfg. Co., 167 N.L.R.B. 520 (1967)). Second, workers compensation benefits which represent compensation for lost wages may be deducted from a backpay award. Workers compensation benefits which represent reparation for permanent physical injury are not deductible. See Canova v. NLRB, 708 F.2d 1498, 1504 (9th Cir.1983) (citing American Mfg. Co., 167 N.L.R.B. 520 (1967)).
The Union urges the court to adopt both of these positions and order that backpay be tolled during the time when a plaintiff was under a disability and further order that any workers compensation benefits received be deducted from that plaintiff's backpay award. If the court were to adopt this approach, the plaintiffs would be penalized and the Union would receive a double benefit from the same event: the court would award no backpay for the period of time a plaintiff was disabled and, at the same time, order that workers compensation benefits actually received be used as an offset against the (nonexistent) backpay award. The court declines to adopt this approach.
The court will select the second approach outlined above. Backpay will continue to accrue during the period in which any plaintiff was disabled; however, any workers compensation award (or portion thereof) which was intended as compensation for lost wages shall be deducted. Any workers compensation award (or portion thereof) which was intended as reparation for permanent physical injury shall not be deducted from the backpay award. The Union has not addressed the purpose behind workers compensation awards under the Kansas statutory scheme. See, e.g., Canova, 708 F.2d 1504 (discussing the distinction between permanent and temporary disability payments under California law). Unless the Union establishes that any plaintiff actually received workers compensation *877 benefits which were designed as compensation for lost wages, as opposed to reparation for permanent injury, no setoffs for workers compensation benefits will be allowed.

G. Mitigation of Damages
A backpay claimant has a duty to mitigate his damages. A claimant's failure to search for alternative work, his refusal to accept substantially equivalent employment, or his voluntary quitting of alternative employment without good cause constitute affirmative defenses to backpay liability. NLRB v. Laredo Packing Co., 730 F.2d 405, 407 (5th Cir.1984) (per curiam). A claimant is not required, however, to accept anything other than suitable interim employment. Id. at 408. The reasonableness of a claimant's efforts to secure substantially equivalent employment is determined by, inter alia, the economic climate and the worker's skill, qualifications, age, and personal limitations. Lundy Packing Co. v. NLRB, 856 F.2d 627, 629 (4th Cir. 1988).
The Union cites Universal Security Instruments, Inc. v. NLRB, 649 F.2d 247 (4th Cir.), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) for the proposition that when an employee rejects an opportunity to transfer to another location upon a plant closing, no backpay liability occurs. In the present case, many of the plaintiffs were given the opportunity to transfer to another Morrell plant in lieu of severance. Apparently, few accepted the transfer option. If the court accepted the Union's position, few, if any, members of the plaintiff class would be entitled to backpay.
Universal Security Instruments does not stand for the proposition the Union asserts. Instead, the Fourth Circuit held that, because the employer did not discriminate against the employees, no backpay could be awarded. 649 F.2d at 261. The court rejects the proposition that the plaintiffs gave up their right to backpay by accepting severance instead of transfer. Morrell breached the contract at Arkansas City. The plaintiffs should not have to accept jobs at a faraway plant of the instigator of the breach.
The Union acknowledges that it bears the burden of proving that the plaintiffs failed to mitigate their damages. Dk. No. 583 at 75. The Union asserts that it is entitled either to depose each member of the plaintiff class or to call each plaintiff as a witness in the damage trial. The Union cites the advisory committee's note to Rule 23 of the Federal Rules of Civil Procedure:
Subdivision (c)(4) This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its "class" character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.
Fed.R.Civ.P. 23 advisory committee's note. This note does not support the Union's position. First, this is not a fraud action. Second, the note does not state that each plaintiff must be examined as a trial witness or deponent in order to prove his claim. If the Union wishes the court to consider the NLRB cases which it cites in its brief (Dk. No. 583 at 77 n. 64) the Union shall provide the court with copies of these (and any other pertinent) cases.
If the Union provides support for its proposition that individual hearings are required for each plaintiff, the court would have to appoint a special master to conduct these proceedings with the 641 plaintiffs, with the attendant costs to be taxed to the Union. See Fed.R.Civ.P. 53(a).

H. Settlement with Morrell
Although not addressed by the parties, the court believes that the amount of Morrell's settlement with the plaintiff class should be deducted from the total amount of backpay and related damages. See Peterson v. Air Line Pilots Ass'n, 622 F.Supp. 232, 237 (M.D.N.C.1985).

V. CONCLUSION
In this opinion, the court has set out many of the legal principles and preliminary *878 rulings which shall govern the further course of this action. Matters which have not yet been finally resolved shall await further briefing or trial. The court shall hold a pretrial conference at a later date.
IT IS BY THE COURT THEREFORE ORDERED that the findings herein on the damage issues shall be the order of the court.
IT IS SO ORDERED.